BOARD OF COUNTY COMMISSIONERS FOR
PRINCE GEORGE'S COUNTY *v.* MELTZER,
ET AL.

[No. 309, September Term, 1964.]

146

*Decided June 1, 1965.*

The cause was argued before Prescott, C. J., and Hammond, Horney, Sybert and Oppenheimer, JJ.

*Harry L. Durity,* with whom were *Robert B. Mathias, Lionell M. Lockhart,* and *Joseph S. Casula* on the brief, for appellant.

*William L. Kahler,* with whom were *DeBlasis & Kahler* on the brief, for appellees.

PRESCOTT, C. J., delivered the opinion of the Court.

Pursuant to Chapter 780 of Acts of 1959, the appellees filed a petition for review by the Circuit Court of Prince George's County of the action of the District Council of the County (Council), which denied appellees' application for reclassification of a parcel of land owned by them containing 86.939 acres. After hearing thereon, the court reversed the action of the Council, and ordered, on July 26, 1964, that the 69.15 acres (certain parcels, such as donations for a school site, construction of roads, etc., had been excepted by the applicants) be reclassified from R-R (rural residential) to R-18 (multiple-family, low-density residential). It is from this order that this appeal has been taken.

The questions presented for our decision are whether or not the action of the Council was supported by competent, material and substantial evidence in view of the entire record as submitted, and, if its action were so supported, was it against the weight of such evidence.

At the outset, we would like to state that the facts for appellate review have been somewhat difficult to ascertain, with accuracy and precision, from the record extract. When a witness testifies from, or concerning, an exhibit, a party anticipating possible appellate review, should be careful to show the specific exhibit to which the witness is referring at any time during the course of his testimony. And when a witness says "over in here," or "this little space outlined in black" (when there are more than one such spaces), indicating a location on an exhibit, the record should show the location to which the witness is referring. Also, when the record extract refers several times to the "Gadowski tract" and thereafter several times to the "Gudelski tract" and reference is actually being made to one and the same

tract, it is desirable to correct the record, or show that the one tract is known by both names.

At the intersection of the Capital Beltway, the circumferential highway for the Nation's Capital (Beltway), and St. Barnabas Road (St. Barnabas), the Beltway runs in a generally east-west direction. St. Barnabas crosses (or undercuts) the Beltway in a northeasterly-southwesterly direction. As it proceeds southwesterly from the Beltway, at a point some 500 to 600 feet, it crosses Oxon Hill Road, which runs nearly parallel to and south of the Beltway. Still proceeding southwesterly at a point some 2400 feet from Oxon Hill Road, St. Barnabas intersects Bock Road. All of these roads, except the Beltway, are comparatively narrow secondary highways. The subject property lies on the southeasterly side of St. Barnabas and extends from a point shortly south of the intersection of St. Barnabas and Oxon Hill Road to a point 150 feet northeasterly of Bock Road. According to petitioner's Exhibit 9, the property is completely surrounded by R-R classifications, except three small commercial zonings across St. Barnabas, one of which was occupied as a filling station, and one as a florist's shop and greenhouse. (At the time of the hearing before the Council, there had been two recent reclassifications from R-R to R-18 across Oxon Hill Road in a northeasterly direction, but the precise location was not shown; one consisted of 15 acres, the other 3½ acres.) To the southeast of the property beginning about 150 feet therefrom, is a subdivision of single family dwellings, and it was from the dwellers therein that most of the opposition came.

At the hearing before the Council, the Technical Staff report of the Prince George's County Planning Board (Planning Board) was offered. It stated that the vicinity zoning pattern is depicted on Exhibit 9, which was adopted in 1949, and the pattern, generally, was "R-R zoning bounding the property on all sides." The subject property is vacant and wooded; to the southeast is the single-residence subdivision mentioned above; to the southwest the land is vacant and wooded with the exception of three single family residences. The report mentions two of the small commercial classifications we named above.

The report further stated that this portion of Prince George's

County "is expected to be one of the fastest growing fringes of the District of Columbia *during the next few decades* [italics ours] * * *." It mentions highways that may be constructed, and that a school site is to be located on the subject property. This is the substance of the report, as it is relevant here. The staff concluded that it would recommend the approval of the reclassification to R-18 for the 69.15 acres. The Planning Board approved its staff's recommendation "as generally stating the Board's opinion concerning this application." It will be noted that, when boiled down, the staff's recommendation is based almost entirely on the fitness of the property for the construction of apartments, and the anticipated increase in population and construction of new roads and a new school.

Counsel for the petitioners stated that the preliminary Land Use Map for this area indicated that the subject property "be incorporated for multi-family housing." He then pointed out that a tract (consisting of some 67 acres) had recently been re-zoned to C-2. (This tract may be roughly described as a long rectangular parcel of land located between the Beltway and Oxon Hill Road. We were informed the reclassification was made to permit the erection of a Regional Shopping Center. To the south of this property is Oxon Hill Road, then a sub-stantial acreage of R-R classification, and then St. Barnabas Road is reached and has to be crossed to reach the subject prop-erty.)

Counsel then stated that "parcels adjacent to the Gadowski [in reality Gudelski] tract have been zoned for apartment use, and there is a further area over in here [indicating] which has been zoned for" apartments. He pointed out two of the small commercial classifications already named.

Mr. Meltzer, a highly reputable builder who will develop the property if the rezoning stands, stated that the property was well suited for apartment construction, and a considerable portion thereof would be lost if single family residences were constructed, unless substantial grading were done.

The petitioners offered an architect, a Mr. Cohen, who in-troduced a topographical map of the property and stated the property was very favorably adoptive to apartment construc-tion. He was of the opinion that one of the favorable aspects

of the property was that it was not directly on the Beltway, which would permit the developers to work out the roads to the Cloverleaf leading to entry thereon. Then Mr. Robinson, a real estate expert, was produced. He thought the property was ideal for apartments. It was close to the Beltway; there was a need for apartments in this area; and apartment construction thereon would not depreciate the value of nearby residential properties.

Mr. Giauque, a representative of the Park and Planning Commission then made a rather long statement. In substance, it pointed out much of what has been said above, and elaborated upon possible new highways (these possible new highways were also mentioned in the Staff Report). Upon cross-examination, he stated that land upon which the new roads were to be constructed was still in private ownership and that he had no idea when the roads could be built. He further stated that a communication from the Washington Suburban Sanitary Commission informed the Commission that water was available at the intersection of Bock Road and St. Barnabas, and that "sewer would require an extension ranging from 500 to 1300 feet to serve this property * * *." From observation, Mr. Giauque thought the sewer appeared to be "closer." He was also of the opinion that "this section of the county is going to represent a population growth of some 400 per cent" i.e., the section "is going to have to take a certain number of additional people," but no mention was made of *when* the 400 per cent peak load would probably be reached (the Staff Report referred to "the next few decades").

A member of the Board of Education stated that his Board, after consideration of the site proposed on the application, had concluded that it was sufficient to take care of school needs. Nothing was said as to whether any plans were under way with reference to the construction of a school, and, if so, when the school might be expected to be erected. Before the case reached the Circuit Court for its consideration, a different site had been agreed upon by the applicants and the public authorities.

The opposition consisted of statements of nearby residents and petitions of objecting property owners. The witnesses were requested not to make repetitious statements or arguments. Al-

though they offered no expert witnesses as such, the opposition gave reasons, which were evidently persuasive to the Council, as to why the reclassification of this large tract should not be granted *at this time*. Summarizing their testimony, they had no objection to their area being planned and developed in an orderly fashion and they realized that progress and change will eventually come, but they did oppose objectionable spot-zoning. In their opinion, there was no need for additional R-18 zoning in their area at present. There was no employment center nearby, and there was no assurance that additional roads, or the school, would be constructed as a part of the apartment complex. Their present area schools were operating at capacity (really over capacity). They had no assurance that the Regional Shopping Center would ever eventuate. If the rezoning of this large tract were granted, it would be an opening wedge to allow additional changes. They felt that new developments should be scheduled so as to occur in proper sequence, so as to minimize the impact upon public facilities and dwellings already constructed. The character of adjacent lands, upon most of which were constructed single family dwellings, had not changed to such an extent as to warrant, at the time of the hearing, the rezoning requested. In fact, the character of the neighborhood had not essentially changed; it was still a rural residential neighborhood of single-family, low-density housing. The roads in the area, including Oxon Hill Road, St. Barnabas, Bock Road, and Brinkley Road (an extension of Oxon Hill) are all very narrow, and at present are usually overloaded, especially during rush hours. Bock Road had been "patched so much" that the "highway people are now patching the patches." There had been no showing that the owners of the subject land were being deprived of any reasonable use of their land. And, although there had been small areas rezoned for high density housing, none existed within about 2 miles of the subject property.

The Council took the application under advisement, and, on April 29, 1963, formally notified applicant's counsel that the application had been disapproved for the reasons that "it is believed that this zoning is premature, is certainly spot-zoning, does not blend in with the present rural-residential surroundings, and that there have been no sufficient changes since the

zoning map was adopted to justify reclassification." An appeal was promptly taken to the Circuit Court, and there the application was submitted to the court on the record made before the Council, with two stipulations added: (1) that on May 15, 1963, "the Park and Planning Commission adopted the Henson Creek Valley Plan with the property in question designated for multi-family or R-18 use"; and (2) that the Board of Education had subsequently selected a different site for the school.

The trial judge held that the evidence showed a sufficient change to justify the reclassification, and "the points made by the opposition were not substantiated to make the matter fairly debatable"; hence the Council's action was not supported by competent, material and substantial evidence. Accordingly, the court passed an order directing the reclassification of the 69.15 acres of land. With this action of the court, we are unable to agree.

Appeals to the courts in zoning reclassification applications in Prince George's County are controlled by Section 59-85 of the Code of Public Local Laws (1963) of that county, the validity of which is not here questioned. We stated at the beginning that two questions are presented for our determination. However, for all practical purposes, they are one and the same question. In *Board v. Oak Hill Farms*, 232 Md. 274, the Court, speaking through Judge Hammond, traced the evolution of the substantiality-of-the-evidence-on-the-entire-record rule, and set forth the rationale of the cases wherein the weight-of-the-evidence rule had been applied. We pointed out that the line between the tests of the two rules is thin and tenuous, and difficult to delineate, and stated:

> "Whether the test of substantial evidence on the entire record or the test of against the weight of all the evidence is followed, the courts have exercised restraint so as not to substitute their judgments for that of the agency and not to choose between equally permissible inferences or make independent determinations of fact, because to do so would be exercising a nonjudicial role. Rather, they have attempted to decide *whether a reasoning mind could reasonably have*

*reached the result the agency reached upon a fair con-
sideration of the fact picture painted by the entire rec-
ord.* (Italics added.)

"In the cases dealing with consideration of the weight
of the evidence, the matter seems to have come down
to whether, all that was before the agency considered,
its action was clearly erroneous or, to use the phrase
which has become standard in Maryland zoning cases,
not fairly debatable."

Our question then, as we see it, is whether a reasoning mind
could reasonably have reached, after a fair consideration of the
entire record, the conclusion that the Council did, or, in other
words, was its action clearly erroneous and therefore not fairly
debatable.

No question of mistake in the comprehensive plan adopted
in 1949 is raised; the applicants rely upon an alleged showing
of such a substantial change in the neighborhood that the Coun-
cil was compelled to grant their request for the reclassification,
and therefore its refusal to do so constituted arbitrary and ca-
pricious conduct. In determining the character of such con-
duct, we must review it in the light of the facts as presented
and conditions as they existed as of the date of the Council's
action. *Bishop v. Bd. of Co. Comm'rs,* 230 Md. 494, and cases
therein cited. The changes relied upon, briefly stated, are these:
three very small commercial zonings across a public highway
from the subject property; two comparatively small R-18 zon-
ings to the northeast of, and across a public highway, therefrom
(with no construction thereon); one vacant large C-2 zoning
for a Regional Shopping Center across (except at the north-
eastern tip thereof) two public highways (with intervening
residential zoning between the highways) therefrom; the Belt-
way (then still under construction) and other roads possibly
to be constructed; a tentative school site agreed upon; water
available at Bock Road and St. Barnabas; and sewer lines some
500 to 1300 feet away.

The above were all factors that properly could be considered
by the Council in determining whether or not to approve the
application, but they fall short, we think, of impelling an ap-

proval at the time the Council acted (it will be remembered that the reasons assigned for disapproval were that the requested rezoning was premature, would constitute spot-zoning, did not blend in with the present residential surroundings, and there had been no *sufficient* changes, etc.).

The evidence, which included the maps, plats and reports, was clearly sufficient to support a finding that the general overall picture of the neighborhood was still that of a rural residential community. The three small commercial properties were apparently, in the opinion of the Council, of rather minor significance. The prospective new roads, other than the Beltway, were, for the main part, in the "possible" or embryo stage. (The members of the Council, who also constitute the County Commissioners of Prince George's County, were presumably in as good a position as any other public officials of that county to determine the possibility of the fruition, and the date thereof, of any new roads.) The school site was merely the probable location of a school at some indeterminate time in the future. The approaching sewer line, the Beltway under construction, the rezonings to the northeast to R-18 and the large commercial rezoning to C-2 were matters of substantial significance to be considered by the Council; but we do not think that they, and the other factors mentioned above, rendered the action of the Council in determining that the granting of the application would be "premature" not fairly debatable. In our opinion, the instant case falls within the category of *Dal Maso v. Bd. of Cty. Comm'rs,* 238 Md. 333. That case had many of the aspects presented here. This Court stated: "In his opinion, Judge Powers found, in evaluating the entire record, that while the appellant had presented much to support his view that the zoning classification of his property should be changed, all of the issues on the record were fairly debatable and that the reversal of the Council would, therefore, be unwarranted. We agree." Also compare *Bd. of Cty. Comm'rs v. Kines,* 329 Md. 119, a case considering aspects some of which are similar to those of the case at bar.

The appellees rely heavily upon *Bishop v. Bd. of Cty. Comm'rs* and *Board v. Oak Hill Farms,* both *supra. Bishop,* as stated in its opinion, presented "some rather unusual facts" and was "on

the borderline as to whether there was or was not enough evidence of changed conditions to bring the case within the area of fair debatability." The case is readily distinguishable from the instant one. We do not deem it necessary to point out all of the distinguishing features, but point out one of very considerable significance. In that case, the Court sustained the action of the Council, to whose responsibility the authority to grant zoning reclassifications has been entrusted, Section 59-83, Code of P.L.L. of Prince George's County (1963); in this case, we are requested to hold that its action was arbitrary and capricious. There is a marked difference between the changes which will justify a reclassification by the zoning authorities and those which impel one.

*Oak Hill Farms,* wherein we held that the action of the Council in denying a reclassification was arbitrary and capricious, is, also, distinguishable. Again, we shall not attempt to state all of the differences between the two cases. A short quotation from the opinion in *Oak Hill Farms* suffices to show the marked differences in the facts of the cases. We said:

> "Along both Branch Avenue and Naylor Road the land is zoned C-1 and C-2 (general commercial), and *is so utilized*, with R-35 zoning to the southeast, R-55 to the south, R-18 to the west, and R-55 to the northwest.
> "There have been *many changes* to commercial zoning, and actual commercial *uses,* in the neighborhood since the last comprehensive zoning plan was adopted in 1949. There are some *one hundred thirty-five acres* of commercially zoned land in the area *surrounding* the land here involved. These marked changes in the neighborhood are expressly conceded by the appellants." (Italics added.)

We hold that a reasoning mind could reasonably have reached, upon a fair consideration of the entire record, the conclusion that the Council did; hence its action was not arbitrary or capricious.

We mentioned above that when the case was before the trial court for hearing, two stipulations, containing facts which had

occurred since the Council's hearing, were agreed upon by counsel for both sides and considered by the court. This meant that the court heard the case upon facts differing from those presented to the Council. We know of no authority for such procedure; on the contrary, Section 59-85 (g) of the County Code provides that after appeal, upon a proper showing that additional and material evidence should be taken, the case shall be remanded to the Council for the taking of such evidence by it. After taking the evidence, the Council may modify or reverse its previous findings, and shall then file such additional evidence, together with its "modifications or new findings or decision," with the reviewing court. This procedure maintains in the Council its authority and function to zone and rezone as anticipated by the zoning legislation, and, at the same time, also maintains the statutory authority of the courts to review the Council's action. If counsel were permitted to add additional facts by stipulation or the court allowed to supplement the facts adduced before the Council by taking additional testimony, it would mean in such instances that the courts, and not the Council, were, in fact and in reality, zoning and rezoning, duties which we have so repeatedly said should not be performed by the courts that the statement has become trite.

However in the present case, we do not feel that the above requires a remand, since the action of the Council was supportable even had the facts contained in the stipulations been before them, and there is a very little, if any, possibility that the Council would have changed its action had those facts been before them. The change of the school site to another location on the subject property is of such minor importance that no more need be said about it. That the Commission's approval of the master plan after the Council's hearing would not have changed the Council's action is obvious. The Council, at its hearing, had full knowledge that the Technical Staff and the Board had approved appellees' application. At, or before, the time of the hearing in the court below, the Council also had been informed of the Commission's action in approving the master plan, as is evidenced by its concurrence in the stipulation to that effect. It is clear that if the Council considered this action of the Commission of sufficient moment to reverse its decision on the ap-

plication, it would not have continued to prosecute its appeal below, or taken an appeal here. Of course, the approval of a master plan by the Commission is a proper factor to be considered by the Council in its deliberation on an application for reclassification, but it does not compel the Council to grant a piecemeal rezoning. Sections 19-6, 59-80, 59-81, 59-83 of the Code of P.L.L. of Prince George's County (1963). If the Council had had this information at the time of its hearing, to consider with the other evidence produced before it, it still would not have rendered its action clearly erroneous and not fairly debatable.

> *Order reversed, and case remanded for the entry of an order in accordance with this opinion; appellees to pay the costs.*