## DEEN, ET AL. v. BALTIMORE GAS AND ELECTRIC COMPANY

[No. 264, September Term, 1965.]

320

*Decided November 11, 1965.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, MARBURY and OPPENHEIMER, JJ.

*Richard A. Reid,* with whom were *Royston, Mueller, Thomas & McLean* on the brief, for appellants.

*James H. Cook,* with whom were *William Baxter* and *Paul S. Clarkson* on the brief, for appellee.

Brief Amicus Curiae filed by Baltimore County, Maryland. *E. Scott Moore, County Solicitor, Walter R. Haile, Deputy*

*County Solicitor* and *Harris James George, Assistant County Solicitor,* on the brief.

MARBURY, J., delivered the opinion of the Court.

The issue involved in this case is whether or not the Baltimore Gas and Electric Company, appellee, will be allowed to place its 115,000 volt (115-kv) transmission line above ground on dodecahedral steel poles throughout its right-of-way from Summerfield to the East Towson substation in Baltimore County. The right-of-way runs for a distance of 5.1 miles and is, with a few exceptions, that property formerly used by the Maryland and Pennsylvania Railroad. Under the zoning ordinances of Baltimore County the Company was required to apply for a special exception in order to construct its high voltage transmission lines above ground. No special exception was needed to place such lines below the surface of the ground. Pursuant to the Baltimore County Zoning Regulations, the Company filed a petition for a special exception with the County Zoning Commissioner in November 1962 asking for a special exception to permit construction of the lines above ground along the entire right-of-way. The appellants herein, and the protestants before the Zoning Commissioner, are owners of property along the five mile right-of-way. These property owners admit that the new line is needed in order to adequately supply the electric power needs of this part of Baltimore County. They maintain that the transmission lines should be placed underground because the proposed above ground structures would decrease property values inasmuch as they would be unsightly and also would be inimical to the health and safety of those who live nearby or who would travel on the highways over which the lines would be strung. On the other hand, the Company does not want to be required to construct the lines underground because underground construction is a great deal more expensive and in turn would have to be reflected in their consumer rates.

The right-of-way over which the Company proposed to place the transmission lines can be conveniently divided into three sections. The first section is from the East Towson substation

easterly to Lot 34, Section 2 in the Cromwell Heights development. This section is within the Metropolitan District of Baltimore County, which is a term used to describe the area of the county serviced by sewer and water. In order for a public utility to obtain a special exception within the Metropolitan District, the Zoning Regulations require that Section 502, and the additional provisions of Section 411, must be met. Within this first section the right-of-way runs for a distance of 5,385.6 feet and the proposed high tension lines would cross Goucher Boulevard and Joppa Road, which are heavily traveled highways; would pass through a heavily built-up residential section of Towson; and also through areas which are zoned M.L. for light manufacturing. The second segment of this right-of-way for which a special exception was requested runs from Lot 34 in Cromwell Heights easterly and then northerly to the easternmost terminus of the Metropolitan District line. It is 6,177.6 feet in length; would cross over both the Loch Raven Boulevard and the Baltimore County Beltway; and would pass through a suburban area. The entire length of this second segment lies within the Metropolitan District. The third section, over which the proposed transmission lines would run, extends from the Metropolitan District line northerly to Summerfield, a distance of 15,364.8 feet. At Summerfield the Company's plan is for the transmission line to connect with a ring line, which is somewhat of an electric power beltway encircling Baltimore City some ten to fifteen miles in radius from the center of the City, a part of which is in Baltimore County. This last segment of the proposed line runs through an area which is presently rural.

After a hearing, the Zoning Commissioner authorized the special exception the Company requested for the area outside the Metropolitan District, *i.e.*, that area described as section three above. Within the Metropolitan District the Commissioner ordered that the transmission lines be placed underground "excluding that portion of the right-of-way in Towson, subject to the Redevelopment and Rehabilitation Commission (approximately 370 feet) and excluding the Manufacturing Zone, * * *."

The Company appealed so much of the Zoning Commission-

er's decision as required it to place any of its transmission lines underground to the County Board of Appeals of Baltimore County, and pursuant to Section 501.6 of the Zoning Regulations a hearing was held de novo. After the hearing, which lasted six days and involved a transcript of 844 pages and nearly 100 exhibits, the Board concluded that a special exception should be granted for the overhead lines along the Company's entire right-of-way except that portion which was from Lot 34 in Cromwell Heights to the East Towson substation, excluding the portions thereof which were zoned for manufacturing. From the Board's decision the Company filed an appeal to the Circuit Court for Baltimore County from that portion of the order which denied the special exception for above ground construction in that area where it ordered the lines to be placed underground, and a cross appeal was filed by the protestants from so much of that order which allowed any of the wires to be strung above ground.

In the Circuit Court, Judge Menchine fully reviewed the entire record, together with memoranda filed on behalf of the respective parties and heard argument of counsel on both sides. He held that the finding of facts by the Board did not support its conclusions of law in regard to that portion of its decision which required the transmission lines to be placed underground, and as a result he ordered that the case be remanded to the Board for the passage of an appropriate order granting the special exception for the construction of the power line upon dodecahedral steel poles for the entire length of the route covered by the Company's petition. The protestants then noted this appeal.

*I*

First to be considered on this appeal is whether or not the Circuit Court was correct in reversing that portion of the Board's order which required the transmission lines to be placed underground from Lot 34 in Cromwell Heights to the East Towson substation, except in manufacturing zones. In regard to that portion of the Board's order, Judge Menchine held that its findings of fact did not support its conclusions of law and thus the decision was arbitrary and capricious in a legal sense, relying upon *Montgomery Co. v. Merlands Club*, 202 Md.

279, 96 A. 2d 261. In fairness to the lower court, it should be pointed out that clarity and internal consistency were not conspicuous attributes of the Board's written opinion. However, a reading of that entire opinion makes it apparent to us that the Board adopted for its findings of fact the testimony of Mr. Gavrelis, Director of Planning for Baltimore County, which was supported by that of a real estate expert. Their testimony clearly supported the Board's conclusion of law and for this reason such a conclusion was not arbitrary or capricious.

Although Mr. Gavrelis' testimony was not specifically adopted by the Board, we feel that the Circuit Court, in its review of the decision of this quasi legislative body, should have concerned itself with the question considered in *Board v. Meltzer,* 239 Md. 144, 153, 210 A. 2d 505, and not with the question of whether the reasons set out in the opinion supported the conclusions of law drawn therefrom. In *Meltzer* we found the test to be: "whether a reasoning mind could reasonably have reached, after a fair consideration of the entire record, the conclusion that the Council [Board] did, or, in other words, was its action clearly erroneous and therefore not fairly debatable." Thus, the court should have looked at all the facts to see if the conclusion reached by the Board was justified.

Section 411.3 of the Baltimore County Zoning Regulations specifically sets out the seven factors which are proper for the Board's consideration in determining whether transmission lines carrying more than 35,000 volts shall be placed underground. Section 411.3 a (7) states as one of these factors to be considered: "Any other matter or thing deemed by him [Zoning Commissioner] or them [Board] to be material in connection with the public health, safety or general welfare." The Planning Commission report, introduced into evidence by the testimony of Mr. Gavrelis, used the following language in reference to that part of the right-of-way which the Board ordered underground:

> "A 100 foot setback is sought between any new residential improvement in new developments and the edge of a high voltage transmission line right of way. Although arbitrary, the extra setback attempts to temper any adverse effect of the power line by extra

distance. Examination of land use data indicates that all of the houses on the north side of Brook Road in the Greenbrier Subdivisions do not conform to this standard nor do all of the dwellings in the Cromwell Heights Subdivision. The Planning staff recommends therefore, that in order best to comply with the health, safety or general welfare that that portion of the transmission lines westerly from a point more or less at Lot 34, Section 2—Cromwell Heights, be placed underground to the terminus in East Towson."

As to the relationship between safety and the 100 feet setback requirement, Mr. Gavrelis testified that the 100 feet zone was established to insure against the possibility of home damage in the event one of the poles carrying high tension wires should fall. The proposed poles will vary in height from 60 to 90 feet and will have crossarms extending 11 feet. The uncontroverted evidence before the Board indicated that high voltage lines have, on occasion, come down in other parts of the country. When the lines fall they remain energized for a fraction of a second after they strike the ground and could thus start a fire if they should come in contact with a combustible substance. In addition, it was undisputed that lines similar to the proposed ones have sagged in close proximity to the ground as the result of an accumulation of ice, snow or sleet, or as the result of a defective tower. Under such circumstances the circuit breakers would not work, since the line would not be grounded, and would thus present a hazard to any person coming in contact therewith. Given the height of the proposed poles, and the chance that falling lines could start a fire which might spread to homes, we think that a reasoning mind could have found a substantial connection between the 100 feet setback requirement and the health, safety and welfare of the people living in close proximity to the high tension wires. The Board was duty bound to consider this factor of safety in determining whether to grant a special exception. In addition to his testimony as to safety, Mr. Gavrelis testified that the presence of above ground high tension wires has a tendency to decrease property values in residential areas. As a planning expert Mr. Gavrelis opined that the 100 feet setback requirement mini-

mized the deflating effect which above ground high tension wires has on land values. Such economic consequences were properly considered by the Board pursuant to Section 411.3 a (6). Besides Mr. Gavrelis, other witnesses, including Hugh E. Gelston, a real estate expert, testified before the Board that in their opinion high tension wires in this area would adversely affect property values. To rebut this, the Company produced Mr. Magee and Mr. Heinmuller, both expert real estate appraisers, who testified that in their opinions overhead lines do not have an adverse effect on property values. Because of the evidence as to safety, coupled with the conclusions which reasonable men could have gleaned from the conflicting testimony as to the effect of high tension wires on nearby property values, we conclude that under the test used in *Meltzer*, the Board was not clearly erroneous when, pursuant to the authority given the Board under Section 411.3, it ordered these high tension wires underground. For that reason this portion of the Board's findings we consider to be supported by competent, material and substantial evidence upon the whole record, and, therefore, was not arbitrary and capricious.

## II

The protestants next contend that within the *manufacturing* zones lying between Lot 34, Cromwell Heights and the East Towson substation, the Board should have ordered the lines to be placed underground. Why the Board did not so order becomes apparent from the clear language of Section 411.3:

> "Electric light and power transmission lines carrying more than 35,000 volts shall be governed by the following principles, standards, rules, conditions and safeguards (in addition to the aforegoing) :
>
> "a. For the purposes of the control of the location and construction of such electric light and power transmission lines, there is hereby created an additional zone which shall conform to the present or future boundaries of the Metropolitan District of Baltimore County and be known as the Metropolitan Zone. Within the said Metropolitan Zone, but excluding *Manufacturing* Zones therein, the Zoning Commissioner or the

County Board of Appeals, upon appeal, shall have the power to require that such electric light and power transmission lines or portions thereof be located underground in cables or conduits.

"In the exercise of such power, the Zoning Commissioner and the County Board of Appeals, upon appeal, shall consider and be guided by the following factors and standards:" (Emphasis supplied.)

Then follows the list of the seven considerations previously referred to in this opinion.

From the above language it would seem that the Board was given no power to order a public utility to place its high tension wires underground within that part of the Metropolitan District which is zoned for manufacturing. To circumvent this section of the Zoning Regulations, appellants cite Section 255.1 of those regulations dealing with manufacturing zones, which reads in pertinent part as follows:

"M. L. Zone—Manufacturing, Light

"Whenever an M. L. Zone abuts or lies across the street from a residential zone * * * the use, height, and area regulations applicable to any part of the M. L. Zone which is within 100 feet of said residential zone * * * shall be those listed in Sections * * * 243 of these regulations. * * *"

Section 243.4 of the Zoning Regulations states:

"Proximity of Structures to Residential Zones — No building or other structure shall be closer than 125 feet at any point to the nearest boundary line of a residential zone."

Appellants' position is that these sections read together impose a 100 to 125 feet (depending on how one interprets the statute) buffer zone between residential and manufacturing areas in which no public utility poles may be constructed because such poles fit within the definition of "structure." Appellants assert that these regulations as applied to the instant case preclude above ground construction in the manufacturing zones of the Cromwell Heights to Towson substation portion of the

right-of-way because in this area there is never the supposedly requisite 100 or 125 feet buffer. By construing the regulations in this manner the appellants lose sight of the fact that the regulations referred to were designed to protect the adjacent residential areas from being in close proximity to manufacturing-type buildings, or, in other words, uses which are normally permitted only in manufacturing zones of the Metropolitan District. To apply these area regulations in the manufacturing zones to structures such as utility poles which are permitted uses, by special exception, in residential areas cannot be sensibly supported, as will be demonstrated below.

It is admitted by the appellants that the proposed 115-kv overhead line is a permitted use, by special exception, in *all* residential zones traversed by the line en route to and through a manufacturing zone. Obviously, as the line approaches the manufacturing zone, the engineering design of the line might well require that a pole be erected on residentially zoned land within 10 or 15 feet of an adjacent manufacturing zone boundary. There can be no logical justification for requiring the next pole, which would be in the manufacturing zone, to be set back a specific distance from the adjacent residential zone from which and through which the poles have been placed. Such an anomalous result could not have been intended by the legislative body which specifically withheld from the County Board of Appeals the power to order that transmission lines through manufacturing districts be placed underground. Since both Sections 255.1 and 243.4 appear under the title "Manufacturing," we feel justified in avoiding the anomaly which arises from the appellants' construction by finding that the legislative intent was to require that *manufacturing* buildings or structures be set back 100 or 125 feet for the benefit of adjacent residential property owners. Thus, Section 243.4 should be construed in a situation such as that which presents itself in the instant case as meaning: "* * * No [manufacturing] building or other [manufacturing] structure shall be closer than 125 feet at any point to the nearest boundary line of a residential zone." Such a construction gives a logical meaning to all of the cited sections when construed together and we therefore adopt it. Since utility poles are not in a true sense manufactur-

ing structures, we conclude the Board was correct in not ordering underground high voltage transmission lines which pass through manufacturing zones within the Cromwell Heights to East Towson substation portion of the Company's right-of-way.

### III

We now consider that portion of the Company's right-of-way which lies within the Metropolitan Zone and which both the Board and the Circuit Court agreed should be constructed above ground, *i. e.*, from Cromwell Heights to the easternmost terminus of the Metropolitan line. The Board, appellants contend, "ignored the importance of Section 411.3 a (1)" which lists for consideration in the grant of a special exception for above ground high tension wires "the crossing of much traveled highways or streets." Within this portion of the Company's right-of-way this factor is said to be of significance since the line will cross "two of the most heavily traveled highways or streets in Baltimore County" (Baltimore County Beltway and Loch Raven Boulevard). The appellants argue that the failure of the Board to give effect to this factor makes the Board's grant of a special exception arbitrary and capricious and that its affirmance, by the Circuit Court on appeal, constituted reversible error.

In regard to this consideration the Board stated as its finding of fact:

> "There is no serious problem involving the crossing of much traveled highways or streets with the exception of the crossing of the major highways at or near the intersection of the Beltway and Loch Raven Boulevard, and we are convinced from testimony in this case that the safest and most practical way of crossing these well traveled highways would be overhead, among other reasons, because it was testified that an underground installation crossing these highways would be as much as twenty-eight (28) feet underground which if there were a breakdown or interruption of service would cause a serious disruption of traffic on these highways while repairs were under way,

as against the comparative ease of repairing any possible breakdown of overhead lines in the same location."

Implicit in the above quoted finding of fact was the conclusion that the relative chance of one of these poles, or of the wires strung on them, falling and injuring a traveler upon the highway was outweighed by the possibility of inconvenience to the general public which might be occasioned by the disruption necessitated in the repairing of underground lines.

The Board did not ignore the importance of Section 411.3 a (1) but instead chose to balance that provision against the equally relevant Section 411.3 a (7) (dealing with matters of public health, safety or general welfare) when it considered the disruptive effect a breakdown of the underground voltage line might have on the flow of highway traffic. Except for the argument that the testimony indicated that the cables would be a maximum of 16 to 18 feet underground, instead of 28 feet, we conclude that there was ample evidence in the record to support the Board's finding on this point and the conclusions drawn therefrom. This being the case, the lower court was correct in affirming the Board's grant of a special exception for above ground construction of high voltage lines throughout the Company's right-of-way lying between Cromwell Heights and the easternmost terminus of the Metropolitan line.

## IV

Lastly, appellants contend that the Board's decision that the line be constructed above ground from the Metropolitan District line to Summerfield was arbitrary and capricious. It will be recalled that this portion of the Company's right-of-way traverses an area which is rural and is not serviced by either public sewer or water facilities. Sections 502 and 411.1 of the Zoning Regulations apply to the grant of special exceptions in areas such as this which lie outside the Metropolitan District. Section 502.1 states that a special exception may be granted if the use requested will not "be detrimental to the health, safety, or general welfare of the locality involved." Appellants assert that it was error for the Board to fail to consider the future effects which the high tension wires would have on the

health, safety and general welfare of the locality "which could be reasonably anticipated in the normal course of its development." This factor was without relevance in this case, because there was no evidence produced at the hearing which would show that the effect of high tension wires on the future health, safety and welfare of this area would be in any respect different than its effect on any other rural area. Section 502.1 implies that the effect on health, safety or general welfare must be in some sense unique or else a special exception could never be granted in such an area for the above ground location of high tension wires. The only evidence as to future conditions was testimony revealing the possibility of future residential development of this land but such a possibility alone does not come close to showing a future deleterious effect upon the public health, safety or general welfare.

The appellant additionally contends that it was arbitrary and capricious for the Board to disregard the serious impairment of the use of neighboring property which would result if the special exception is granted. Although not specifically cited in appellant's brief, such a factor is proper for the Board's consideration under Section 411.1 which states: "The use must be needed for the proper rendition of the public utility service and the location thereof shall not seriously impair the use of neighboring property." In the instant case it was uncontroverted that there is presently a need for a new transmission line to the Towson area and that the proposed line would be less disrupting and less costly than a line constructed elsewhere, since it runs largely along property which was once used as a railroad right-of-way. Moreover, the evidence shows, as found by Judge Menchine in his review of the evidence before the Board, "that the proposed line is of a more harmonious appearance than could be hoped for from any other route, for the reason that, in large part, it lies below the ridge line to the south and is screened from the view of properties lying to the north by trees." While it is true that the appellants did produce an expert, Hugh E. Gelston, who testified that the best use of this rural property would be for prestige type homes in the $50,000 category in acre or half acre lots, and that the proposed above ground power lines would impair such a use; there was no

showing that other less pretentious residential uses could not be made of this property. Thus, the Board was not arbitrary and capricious in failing to find that there would be a serious impairment of the use of this land and we, therefore, have no difficulty in concluding that such part of the order of the lower court sustaining the authorization of construction of the transmission line upon dodecahedral poles from the Metropolitan District line to Summerfield was justified.

In its brief and oral argument before this Court, the Company sought to raise the issue of whether certain provisions of the Zoning Regulations authorize overhead construction throughout that portion of its route ordered underground by the Board, without the necessity of a special exception therefor. We do not deem it necessary to decide this because the Company did not file a cross appeal from the lower court's grant of a special exception for this area, and thus the question is not properly before us.

For the reasons stated such part of the order of the lower court as differs from the order of the Board of Zoning Appeals dated January 14, 1965, will be reversed and the order of the Board will be reinstated.

> *Order of June 17, 1965 reversed in part and modified so as to conform to the order of the County Board of Appeals of Baltimore County, of January 14, 1965, and as modified affirmed. Costs to be paid one-half by each side.*