720 A.2d 925

**AT & T WIRELESS SERVICES**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

No. 1628, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Nov. 25, 1998.

682

Paul A. Dorf and Russell G. Alion, Jr. (F. Kirk Kolodner and Adelberg, Rudow, Dorf, Hendler & Sameth, L.L.C., on the brief), Baltimore, for Appellant.

Sandra R. Gutman, Associate Sol. (Frank C. Derr, Deputy City Sol., on the brief), Baltimore, for Appellee.

Argued before HARRELL and SALMON, JJ., and ROBERT F. SWEENEY, Judge (Retired, Specially Assigned).

SALMON, Judge.

AT & T Wireless Services ("AT & T") wants to build a telecommunications facility in the Ten Hills section of Baltimore City. The proposed facility will be composed of a 143 foot monopole with nine low-power antennas, a twelve-foot concrete pad for equipment cabinetry, and a twelve-foot chain-link fence. The tower facility was to be erected on property leased by AT & T from the Hunting Hills Swimming Club at 300 Knottingham Road. The swimclub site is within an R–1 zoning district, which is the most restrictive district in the city, permitting, as of right, only single-family detached dwellings and uses such as schools, libraries, and museums. The telecommunications facility proposed by AT & T is permitted in an R–1 district provided that a conditional use permit is granted.[1]

AT & T has been granted a license by the Federal Communications Commission to provide wireless telecommunications services in the Baltimore–Washington metropolitan area. In connection with the building of its wireless personal communication service (PSC) system, AT & T requires multiple antenna sites for radio links in that system. The proposed site, at the swimclub facility, is a critical component of AT & T's nationwide wireless PCS system because it covers an important segment of Frederick Avenue, Edmondson Avenue, and the surrounding residential areas that are not currently covered by an AT & T facility.

AT & T applied for a conditional use permit to erect the tower facility with the Board of Municipal and Zoning Appeals (Board). The permit application was opposed by the Mayor and City Council of Baltimore City (the City) and by the Ten Hills Community Association (Ten Hills). The Board denied

---

1. In this opinion, the terms "conditional use" and "special exception" are used interchangeably because they are generally synonymous. *Schultz v. Pritts*, 291 Md. 1, 23, 432 A.2d 1319 (1981). We recognize that in Baltimore City the terms are not used synonymously in its zoning ordinance; however, for purposes of our legal analysis of the issues presented and the relevant case law bearing on those issues, the terms may be treated as synonymous.

the conditional use permit, and AT & T appealed the denial to the Circuit Court for Baltimore City. The circuit court, after a hearing, ruled, in pertinent part, as follows:

> [A] careful reading of the Board's decision indicates that it never explicitly set forth what, if any, adverse effects of the Tower at the proposed site would be greater than the adverse effects at another location. The decision does summarize the evidence, but it gives no reasoning or rationale for the Board's ultimate decision and, in particular, does not apply the *Schultz[ v. Pritts,* 291 Md. 1, 432 A.2d 1319 (1981),] standard. Under these circumstances, a remand is appropriate for the purpose of permitting the Board to make its required findings.

The trial court went on to say, however, that there was sufficient evidence in the record, if believed, from which the Board could have found that the proposed tower facility "would cause an adverse effect upon adjoining properties in the Ten Hills community unique and different in kind than if it were located at another site in the area." The trial court also said

> that there was no evidence to support AT & T's claim that the Board, in denying the application, violated the anti-discrimination provisions of the Telecommunications Act of 1996 (the 'Act'), and that the Act does not prohibit a remand of the matter to the Board so that the Board could apply the correct principles of law under *Schultz v. Pritts.*

AT & T filed this appeal and raises five issues, which we have consolidated and rephrased for clarity:

1. Did the Board apply the correct principles of law in reviewing AT & T's application?

2. Were there facts developed in the record before the Board that would support a denial of AT & T's conditional use permit?

3. Did the Board's decision to deny AT & T's application violate the anti-discrimination provisions of the Telecommunications Act of 1966?

4. Does the Telecommunications Act of 1996 require this Court to compel the Board to grant the application, rather than remand the matter to the Board for further proceedings?

We shall answer the first two questions in the negative and reverse. It is therefore unnecessary to answer the final two questions.

## FACTS DEVELOPED AT THE HEARING
## BEFORE THE BOARD

Jack Miglioritti, a senior project manager with D. Garvey Corporation, testified that he had researched suitable sites within the general ring or coverage area that required the tower facility. He selected the proposed site because, in his opinion, the dense woodland that surrounds the proposed site provides an ideal natural buffer between the site and the adjacent residences, causing a minimal amount of visual intrusion to the surrounding community. He testified that he took into consideration, in selecting the site, the fact that adjacent residences are a "considerable distance" from the site. The trees that surround the area, although they, of course, vary in height, are approximately seventy-feet tall; the woodland is "dense" and "mature." Another favorable attribute of the site, according to Miglioritti, was that access to it would require very little intrusion to the surrounding community.

AT & T proffered, and the Board accepted, the testimony of Robert Warlock, a project manager with Daft, McCune, Walker, Inc., that the establishment, maintenance, and operation of the tower facility would not be detrimental to or endanger the public health, security, general welfare, or morals of the surrounding community and therefore satisfied the standards for special exceptions as set forth in Section 11.0–5a of the Zoning Ordinance for Baltimore City.

Mr. Miglioritti also testified that in researching suitable sites for the tower facility he had contacted the Baltimore City Fire Department in an attempt to work out an agreement so that AT & T could "co-locate" its antennas at the fire depart-

ment's proposed tower, which, if a special exception were granted, was to be located at the Edmondson High School, in an R–6 zone. His efforts to lease property from the fire department was, however, unfruitful because the fire department did not respond to his proposals.

A radio frequency engineer testified that AT & T needed to place their antennas in certain designated areas throughout Baltimore City in order to avoid coverage gaps or "dead spots" in its wireless PCS system. Seamless coverage through Baltimore is necessary to prevent a telephone user from experiencing a black-out (losing a phone call) or receiving a busy signal if a call is made into a "dead spot." The witness testified that AT & T had already placed antennas in various locations throughout Baltimore City, but a coverage gap presently existed in the Frederick Road–Edmondson Avenue–Route 40 corridor. Therefore, a facility in the vicinity of the proposed location was needed. The Baltimore City Bureau of Transportation and the fire department had no objection to AT & T's application.

Oakleigh Thorne, a real estate appraiser, testified for AT & T that installation of the tower facility would have no effect on land values in the surrounding residential area. Mr. Thorne told the Board that he had performed a study of land values in residential communities where similar transmission towers existed, including Fairfax County, Virginia, and Howard and Montgomery Counties, Maryland. Mr. Thorne testified that the residential communities of Fairfax Station in Virginia and Clearview Estates in Howard County had similar land property values as those that existed in the Ten Hills community that surrounded the proposed site. Mr. Thorne said that the cellular transmission tower located in the Fairfax Station and Clearview Estates subdivisions had no effect on residential property values in those communities. He distinguished Fairfax Station and Clearview Estates from the Ten Hills community, and the general area surrounding the proposed site, because no wooded buffer existed at the other locations to screen the standing tower from the views of adjacent property owners. Mr. Thorne testified that the proposed tower in the

Ten Hills community would be "the most isolated, completely buffered tower" of all the towers he studied. He also concluded that building of the tower facility at the proposed site would have no negative impact on residential property values in the adjacent community because the existing woodland provided a natural buffer between the proposed site and adjacent residences.

Other witnesses, on behalf of AT & T, testified that the proposed tower facility would be safe and structurally stable and would cause no detrimental effect to the surrounding neighborhood. The Baltimore City Department of Planning opposed the application for the conditional use and recommended that AT & T either seek an alternative location that would be less visibly intrusive to the community or co-locate the antenna on an existing tower facility in the surrounding area. Susan Williams, the Chief of Planning for the Baltimore City Planning Department, testified that the only reason her department recommended disapproval of the application was because some residents would see the proposed site from their homes. In Ms. Williams's words:

> This particular location is extremely unique in its character. It is a very bucolic setting. Even though you have seen proposals that show numerous trees through the area, interspersed with many of those trees are quaint, single-family homes. The area takes on a characteristic of probably one of the most rural areas in the City of Baltimore. There are homes directly on Nottingham Road and Apple Gate Avenue, and I think you will hear testimony directly from people who live in this area who will be impacted, who will see this tower from their homes, essentially. It is, it is on this basis that the staff recommends disapproval. We don't think this is like ever[y] other antenna site. And indeed, we have recommended approval of antennas in residential communities.

The Director of the Department of Planning of Baltimore City, Charles C. Graves, III, submitted a letter to the Board in which he also objected to the conditional use permit. He gave three reasons that he described as "land use concerns."

First, the Ten Hill community is composed of "close to" two hundred plus homes, and the facility would be located "in the heart of that community" even though "there are less visually intrusive sites for the tower." Second, residential lots are located "close to the site." Third, the tower facility would remove five parking spaces from the swimclub parking lot. Although, as we have noted, Mr. Graves asserted that there were "less visually intrusive sites" for the tower, he did not say that there were any within the R–1 zone.

Mr. Graves's letter stressed that his department had in the past "worked diligently" with AT & T to locate sites for their antennas that were "the least visibly intrusive." Yet, according to Mr. Graves, only once, out of seventy-two communication antenna applications submitted by AT & T and its competitors for review prior to the subject one, had the department recommended disapproval. Mr. Graves also pointed out that the Ten Hills Community Association supported "the co-location of the AT & T antennas" on the fire department's proposed emergency tower at the Edmondson High School location.

At the hearing, a number of citizens who lived near the proposed facility testified against the grant of AT & T's application. Arthur Johnson, who lives at 403 North Chapel Gate Lane, about three hundred feet from the site, testified that the proposed use would adversely impact upon his property. He testified that, except for the summer months when the foliage on the trees are in bloom, the grounds of the swimclub, which are adjacent to his residence, are clearly visible to the homes located on North Chapel Gate Lane and that the tower, when it is erected, would obviously also be visible when the impliedly deciduous trees had shed their foliage.

Another witness, who lives in the Ten Hills community at 432 Drury Lane, testified that Ten Hills is an old and unique community where even the telephone wires are hidden from view. Telephone wires are at the rear of the homes rather than on the streets. The witness opined that the proposed tower, because of its size and visibility, would negatively

impact the area. Mary Beverunger, who also lives in the Ten Hills area, testified that if the Edmondson High School site was approved, AT & T would be able to use the tower constructed there and would not need to construct an additional tower at the proposed site. She opined that because there would be no need to construct a tower on Knottingham Road she opposed its construction. Thomas Devlin, a representative of the Ten Hills Community Association, and Kerry Weil, a resident of Ten Hills, wrote to the Board and opposed the tower construction because of "concerns" about the proximity of the structure to the residential properties and its impact on property values in the community.

On June 13, 1997, the Board issued its written opinion. It summarized the testimony of all the witnesses but made almost no findings of fact, including failing to define specifically the neighborhood of the subject property. The Board wrote:

The Board, in making it's [sic] decision to disapprove this appeal has considered the standards for conditional uses under Section 11.0–5a of the Zoning Ordinance listed below, particularly items 1, 4 and 12. The Board is aware of the appellant's testimony and the testimony of expert witnesses that the tower would not be detrimental to the health and safety of the community nor would it adversely affect real estate values or the aesthetic beauty of the area. The Board, in making its decision, felt that time is not a critical issue in the placement of the tower when there is an opportunity to co-locate the tower in another area and still satisfy the needs of the appellant and all parties involved. The Board felt that the placement of the monopole in the Ten Hills community and using the wooded areas as a buffer would only be seasonable at best and that there is a suitable site elsewhere in the area needed to be served. Each residential community, or any community for that matter, has it's [sic] own unique qualities and characteristics distinctive of itself. A use believed to be injurious at one site in a community to be served could very well be an asset at another site in the same community, therefore benefit[t]ing all parties involved. The Board is also aware of the

testimony from the Department of Planning stating that out of approximately seventy-three prior sites for towers/antennas, the Department of Planning was able to accommodate seventy-two of those sites to the satisfaction of all parties involved. The Board feels that if the appellant works with the Department of Planning, a mutually agreeable site can be found.

The Board went on to say that the proposed use would not menace or endanger the public health, security, general welfare, or morals. It further stated that it had considered the twelve factors that it is required to consider under 11.0–5 of the Baltimore City Zoning Code.[2]

Additional facts will be set forth in order to answer the questions presented.

---

2. Those standards are:

   a. *Standards for Conditional Uses.* No conditional use shall be authorized unless the Board finds in each specific case that the establishment, maintenance, or operation of the conditional use will not be detrimental to or endanger the public health, security, general welfare, or morals, and, as a further guide to their decision upon the facts of each case, they shall give consideration to the following, where appropriate:
   1. the nature of the proposed site, including its size and shape and the proposed size, shape, and arrangement of structures;
   2. the resulting traffic patterns and adequacy of proposed off-street parking and loading;
   3. the nature of the surrounding area and the extent to which the proposed use might impair its present and future development;
   4. the proximity of dwellings, churches, schools, public structures, and other places of public gathering.
   5. accessibility of the premises for fire and police protection;
   6. accessibility of light and air to the premises and to the property in the vicinity;
   7. the type and location of adequate utilities, access roads, drainage, and other necessary facilities that have been or will be provided;
   8. the preservation of cultural and historic landmarks;
   9. any Urban Renewal Plan approved by the Mayor and City Council or the Master Plan for the City approved by the Planning Commission;
   10. all standards and requirements contained in this ordinance;
   11. the intent and purpose of this ordinance as set forth in Chapter 1; and

## ISSUE 1

Did the Board apply the correct principles of law in reviewing AT & T's application?

■  Both parties to this appeal agree that the "correct principles of law" are those set forth in *Schultz, supra.*  In *Schultz*, the Court of Appeals said:

The special exception use is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible *absent any fact or circumstance negating the presumption.*  The duties given the Board are to judge whether the *neighboring properties in the general neighborhood would be adversely affected* and whether the use in the particular case is in harmony with the general purpose and intent of the plan.

...  *The extent of any harm or disturbance to the neighboring area and uses is, of course, material.*  If the evidence makes the question of harm or disturbance or the question of the disruption of the harmony of the comprehensive plan of zoning fairly debatable, the matter is one for the Board to decide.  But if there is no probative evidence of harm or disturbance in light of the nature of the zone involved or of factors causing disharmony to the operation of the comprehensive plan, a denial of an application for a special exception use is arbitrary, capricious and illegal. These standards dictate that if a requested special exception use is properly determined to have an adverse effect upon neighboring properties in the general area, it must be denied.

*Schultz*, 291 Md. at 11–12, 432 A.2d 1319 (second emphasis added).

---

12.  any other matters considered to be in the interest of the general welfare.

In short, the test, as developed in *Schultz,* is not whether a special exception is compatible with permitted uses in a zone or whether a conditional use will have adverse effects. Adverse effects are implied in all special exceptions. The standard to be considered by the Board is whether the adverse effects of the use at the particular location proposed would be greater than the adverse effects ordinarily associated with that use elsewhere within the R–1 zone. *Mossburg v. Montgomery County,* 107 Md.App. 1, 8–9, 666 A.2d 1253 (1995), *cert. denied,* 341 Md. 649, 672 A.2d 623 (1996). As the Court of Appeals said in *Board of County Comm'rs v. Holbrook,* 314 Md. 210, 217–18, 550 A.2d 664 (1988):

> [W]here the facts and circumstances indicate that the particular special exception use and location proposed would cause an adverse effect upon adjoining and surrounding properties *unique and different, in kind or degree, than that inherently associated with such a use regardless of its location within the zone,* the application should be denied. Furthermore, if the evidence makes the issue of harm fairly debatable, the matter is one for the Board's decision, and should not be second-guessed by an appellate court.

(Emphasis added.)

The trial court found, and both parties to this appeal agree, that the Board never explicitly set forth what, if any, adverse effects of the tower facility at the proposed site would be greater than the adverse effects at another location within the R–1 zone. It was for this reason that the trial court remanded the case for the purpose of permitting the Board to make "its required findings." We agree with the parties and with the lower court in its conclusion that the Board did not apply the proper test in denying AT & T's request for a conditional use permit.

### ISSUE 2

Were there facts developed in the record before the Board that would support a denial of AT & T's conditional use permit?

The trial court was of the view

that there would be substantial evidence in the record to support a conclusion that the proposed tower would cause an adverse effect upon the adjoining properties in the Ten Hills community unique and different in kind than if it were located at another site in the area. At the very least[,] the record indicates that it is 'fairly debatable' and under the deferential standard of review, a decision that comported with the *Schultz* standard would be upheld.

The Court pointed to the testimony of Susan Williams that Ten Hills was "extremely unique"; that the setting was "very bucolic"; that the area was "probably one of the most rural areas in the City of Baltimore"; and that the tower facility would adversely affect the homes directly adjacent to the proposed site. The trial court also relied upon the testimony from residents who lived near the proposed site who testified to the decrease in property values and aesthetics problems created by the proposed use. The trial court also opined that the record supported a finding that the location of the tower at the proposed site, because of the neighborhood's special character, would have adverse aesthetic effects above and beyond its location elsewhere within the zone. The trial court concluded that it also would not be "unreasonable" for the Board to give weight to the community members' assumption that the presence of the tower located adjacent to their unique setting would adversely affect their property values.

We agree with the trial court that the Board could, on remand, reject the opinion of the real estate appraiser hired by AT & T and accept the testimony of the property owners in the Ten Hills community who testified that the value of their property would be adversely affected by the presence of the tower facility. But even assuming that the property values were adversely affected, that effect would be caused solely by the negative aesthetic consequences of having the tower nearby. The consequences of such adverse aesthetic effects have been discussed in numerous cases dealing with the grant or denial of special exceptions. Three of those cases are of particular importance for purposes of our discussion. The three cases are *Anderson v. Sawyer*, 23 Md.App. 612, 329 A.2d

716 (1974); *Board of County Comm'rs v. Holbrook*, 314 Md. 210, 550 A.2d 664 (1988); and *Evans v. Shore Communications, Inc.*, 112 Md.App. 284, 685 A.2d 454 (1996).

The *Anderson* case involved an application for a special exception to operate a funeral home in a residential district. In *Anderson*, we reversed the denial of the special exception because there was no evidence showing that the requested special exception would adversely affect the surrounding area in any way different from its adverse effect in any other residential district. We explained:

> The presumption that the general welfare is promoted by allowing funeral homes in a residential use district, notwithstanding their inherent depressing effects, cannot be overcome unless there are strong and substantial existing facts or circumstances showing that the particularized proposed use has detrimental effects above and beyond the inherent ones ordinarily associated with such uses. Consequently, the bald allegation that a funeral home use is inherently psychologically depressing and adversely influences adjoining property values, as well as other evidence which confirms that generally accepted conclusion, is insufficient to overcome the presumption that such a use promotes the general welfare of a local community. Because there were neither facts nor valid reasons to support the conclusion that the grant of the requested special exception would adversely affect adjoining and surrounding properties in any way other than would result from the location of any funeral home in any residential zone, the evidence presented by the protestants was, in effect, no evidence at all.

*Anderson*, 23 Md.App. at 624–25, 329 A.2d 716.

In the present case, there was no evidence that there was any place in an R–1 zone where the adverse aesthetic effects of a tower would be less than if it were located at the proposed site. Numerous other cases since *Anderson* have followed its precepts. *See, e.g., Mossburg*, 107 Md.App. at 13, 666 A.2d 1253 (stating that in reviewing the Board's decision the court "look[s] for evidence, if any, in the record of the adverse

effects and impact that could generally be expected as an inherent adverse impact anywhere in the I–2 Zone in order to determine whether the environmental and traffic safety impact at the subject site is greater"); *People's Counsel for Baltimore County v. Mangione,* 85 Md.App. 738, 750, 584 A.2d 1318 (1991) (stating that the Court "shall review facts and circumstances upon which the Board could have found that the special exception use and location proposed would cause an adverse effect upon adjoining and surrounding properties unique and different, in kind or degree, than that inherently associated with such a use regardless of its location within the zone").

Although there was no detailed evidence on the subject, the persons who opposed AT & T's conditional use permit appeared to be of the view that there would be less adverse consequences if AT & T's tower facility were located at Edmondson High School than at the proposed site. There are two problems with that testimony. First, the Edmondson High School site was not in an R–1 zone—it was in an R–6 zone, and the test, as applied in *Anderson, Schultz,* and other cases already cited, is whether the use will produce a harm that would have an adverse effect above and beyond those inherently associated with such a special exception use "irrespective of its location within the zone." *Schultz, supra,* 291 Md. at 15, 432 A.2d 1319. Moreover, at the time of the hearing on AT & T's application, the Board had not granted the special exception at the Edmondson High School site, and in any event, there was no indication in the record that AT & T could work out a lease with the fire department that would allow AT & T to co-locate at the location. Lastly, there was no evidence that the tower, if it were located at Edmondson High School, would be less visibly intrusive to neighboring properties than it would be if located at the proposed site.

In *Holbrook v. Board of County Comm'rs,* 70 Md.App. 207, 520 A.2d 1096 (1987), *rev'd,* 314 Md. 210, 550 A.2d 664 (1988), a property owner applied for a special exception to allow him to station his mobile home on land adjacent to property on which a new residence with an appraised value of $147,000 had just

been built. *Id.* at 210, 550 A.2d 664. The owner of the new home protested the granting of the special exception at the Zoning Board appeals hearing on the ground that the mobile home would be detrimental to the value of her home and, as proof, presented photographs of the mobile home as seen from her property. *Id.* The Board of Appeals denied the special exception, finding that the mobile home would diminish property values of the adjoining property and create an adverse effect greater than if it were located in other areas in the zone. *Id.* at 211, 550 A.2d 664. We reversed that decision, holding that there was no substantial evidence before the Board of Appeals to meet the *Schultz* test. *Holbrook,* 70 Md.App. at 217, 520 A.2d 1096. The Court of Appeals, in turn, reversed this Court and found that, under the facts and circumstances of that case, the testimony and photographs showed that a mobile home, at the proposed location, would impair property values to a greater extent that it would elsewhere in the zone and that other locations existed that would have less of an adverse impact than did the proposed site. *Holbrook,* 314 Md. at 219–20, 550 A.2d 664. The Court pointed out that the $147,000 residence was in a "uniquely valuable, heavily forested, low growth area," *id.* at 219, 550 A.2d 664, and concluded that countless locations existed within the zone and indeed within the applicant's own property where the presence of a mobile home would have no adverse effect whatsoever upon adjoining property values due to the fact that the mobile home would be shielded from view by trees or other topographical features. *Id.* at 220, 550 A.2d 664.

It is true, as Baltimore City points out, that the trees that surround the tower facility would not shield the tower facility from the view of nearby property owners for many months in the fall and winter. But unlike the situation in *Holbrook,* in the case at hand there was simply no evidence that there was any place within an R–1 zone that a 133 foot monopole could be located where it could not be seen by adjoining property owners.

Perhaps the case that is most closely on point is *Evans, supra,* where the landowner asked for a special exception to

construct a two hundred foot, three-legged, free-standing, lattice-type metal tower. 112 Md.App. at 287–90, 685 A.2d 454. The proposed site of the tower was a five-acre parcel, zoned agricultural. *Id.* A real estate appraiser testified as an expert for the landowner. He concluded that the proposed tower at the proposed site would have no adverse effect on real estate values in the neighborhood above and beyond the effect that is inherently associated with the location of a tower. *Id.* at 294, 685 A.2d 454. At the hearing, numerous property owners testified against the grant of the special exception. *Id.* at 296–98, 685 A.2d 454. Property owners testified that, in their view, the proposed tower would depress property values and would be unsightly.[3] In *Evans,* the Board denied the special exception, but the trial court concluded that the Board's decision could not have been reasonably based on the facts before it and ordered the Board to grant the special exception. *Id.* at 301, 685 A.2d 454. This Court affirmed the trial court's decision to remand the case with instructions to grant the special exception. In doing so, we held that the Board had erred in failing to apply the *Schultz* test. *Id.* at 304, 685 A.2d 454. We reasoned:

> Finally, the Board concluded that the proposed use was not compatible with the pattern of existing developed land use in that "the proposed tower is unique to the pattern of existing developed land use in the vicinity." The Board opined that the tower would be detrimental to the use of nearby residents in terms of the use and enjoyment of the rural character of their property. Clearly, the section of the Comprehensive Plan titled, "Rural and Agricultural Conservation Areas," provides for conservation of the rural and agrarian character of the area in the face of expanding suburban and residential development. The Board fails to state how construction of the tower in question undermines the rural character of the neighborhood and somehow transforms the area into a neighborhood antithetical in character

---

**3.** The property was located in an RAC (Rural/Agricultural Conservation District).

to that of a rural neighborhood. The uniqueness referred to by the Board must be in terms of adverse effects and the adverse effects must be above and beyond those inherently associated with the location of a special exception use any where else within the zone. *See Deed [Deen] v. Baltimore Gas & Electric Co.,* 240 Md. 317, 331 [214 A.2d 146] (1965); *Mossburg,* 107 Md.App. at 24–25 [666 A.2d 1253].

While it appears that the Board reached the wrong conclusions based on the facts before it, we believe that, had it applied the correct standard, the only proper decision it could have reached on the evidence before it would have been a grant of the special exception. We affirm the trial court's remand for the Board to grant the application for special exception, and instruct the Board to apply the proper legal standard to the evidence.

*Id.* at 305, 685 A.2d 454.

There was testimony that the Ten Hills area was "bucolic" and "rural," but again, similar to the situation in *Evans,* the Board failed to state how construction of the tower in question would undermine the rural or bucolic character of Ten Hills or how it would transform the area into a neighborhood "antithetical in character" to that of a rural or bucolic neighborhood. Similarly, although the Ten Hills community may be "unique," there was no showing that the community's uniqueness would make the presence of a tower more harmful than it would otherwise be if it were located elsewhere in the R–1 zone. The evidence showed that the Ten Hills community was a well-established community with houses located on large, heavily forested lots. Because the area was not densely populated, that unique feature would, if anything, make the site more appropriate for a tower in an R–1 zone because fewer persons could see it. Additionally, the fact that the houses are on lots surrounded by numerous trees would make the tower facility less objectionable, or at least less visible, than it would if it were located in an area denuded of trees. In sum, we conclude that the subject case cannot be distinguished in material respect from *Evans, supra.*

Accordingly, we reverse the trial court. On the record before the Board, there was not substantial evidence to support a denial of the conditional use application according to the correct analytical touchstones for such a case. Accordingly, it was not within the Board's discretionary range to do other than grant the conditional use. *See Mayor & City Council of Baltimore v. Foster & Kleiser,* 46 Md.App. 163, 171–72, 416 A.2d 762 (1980). The trial court should remand the case to the Board, with instructions to grant the conditional use permit requested by AT & T.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS TO REMAND THE CASE TO THE BALTIMORE CITY BOARD OF MUNICIPAL AND ZONING APPEALS FOR ADOPTION OF FINDINGS OF FACT AND CONCLUSIONS OF LAW GRANTING THE CONDITIONAL USE (WITH OR WITHOUT APPROPRIATE AND LAWFUL CONDITIONS); COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**