653 A.2d 532

**CHESTER HAVEN BEACH PARTNERSHIP**

v.

**BOARD OF APPEALS FOR QUEEN ANNE'S COUNTY.**

**No. 794, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Feb. 9, 1995.

Howard L. Alderman, Jr. (Julius W. Lichter and Levin & Gann, P.A., on the brief), Towson, for appellant.

No brief or appearance by appellee.

Argued before CATHELL, HARRELL and MURPHY, JJ.

CATHELL, Judge.

Appellant, Chester Haven Beach Partnership, appeals a judgment of the Circuit Court for Queen Anne's County (Wise, J.), affirming the denial by appellee, the Queen Anne's County Board of Appeals (Board), of appellant's requests for a condi-

tional use and for several variances. Appellant presents three issues:

I. Whether the Board of Appeals may deny a request for (i) a variance and (ii) a conditional use approval, both under the Queen Anne's County Zoning Ordinance, without delineating or applying any decisional standard, and even though Appellant presented uncontroverted testimony and evidence to support all statutory prerequisites with no countervailing evidence presented.

II. Whether the Board of Appeals may interpret § 5000 of the Queen Anne's County Critical Area Ordinance in a manner at odds with the intent of the provision as manifested by the plain meaning of the ordinance, the testimony of a drafter of part of the provision from the Office of Planning and Zoning and the testimony of Appellant's expert.

III. Whether the Board's finding, that the Appellant had not satisfied its burden of proving that it was the owner of land subdivided and recorded as of 1959 was arbitrary, capricious and illegal in light of the evidence presented.

## The Facts

As this case was presented to the Board, much of the information submitted on behalf of appellant was by way of an opening statement by appellant's counsel. In his opening statement, counsel gave a history of his knowledge of certain land planning legislative processes in Queen Anne's County and then informed the Board, while still in opening statement, of some of the history of the property, including a statement that the property at issue was subject to a prior recorded plat. Counsel then introduced (apparently in evidence) certain deeds in the chain of title to the property. He then asked to introduce a memorandum of arguments applicant desired to present in respect to the application, stating: "[T]his will be my memorandum as far as the legal authority ... this has nothing to do with testimony."

The Board then introduced, as applicant's exhibits, a copy of the sectional zoning map and a letter from a Mr. Nickerson,

Director of Environment Health Services. The letter, on Health Department stationery contained the following language: "There are no objections to this proposal by the 'Approving Authority' if the project is served by public water and public sewer." The Board, with the concurrence of appellant's counsel, then introduced a letter from the State Highway Administration, Engineering Access Permits Division, stating that it similarly had no objection, "as there are no State highways involved." Also introduced was the note of the staff of the Chesapeake Bay Critical Area Commission, stating that "[t]here are no comments at this time."

Counsel, resuming his opening statement, then informed the Board that the developing coordinator for the partnership might be called upon to testify. Counsel then described the partnership to the Board and counsel's past and present relationship to that partnership and its various partners. He then told the Board how the partnership operated.

Until this point, other than the exhibits offered, nothing was in evidence. Counsel's opening comments, for the most part, lacked relevance in respect to the issues now asserted on appeal. Thereafter, counsel called as a witness Mr. Michael Whitehill, the branch manager of McCrone, Inc., engineers, planners, and surveyors for the project. Mr. Whitehill described, *inter alia*, the type of subdivision sought to be established and the history of percolation tests. A letter dated June 7, 1976, was introduced through him, informing the owners of the property of serious percolation problems and noting therein that "even though this is a subdivision of record in Queen Anne's County, each application for a septic tank permit must be evaluated on its own merit." Mr. Whitehill then discussed the new developmental planning process, *i.e.*, from an older subdivision plan to the one then being submitted.

Appellant attempted to assert at oral argument that the previous recordation of a subdivision on the subject site prior to the enactment of zoning is what made this property unique

for variance purposes.   This argument, as we shall explain, is proffered for the first time on appeal.

Initially, we note that appellant's application stated:

Conditional use approval is sought to permit planned residential development in the existing NC–15 zone for Section 7203E of Q.A. Co. zoning ordinance and a variance from Section 7203E condition 1 is sought to permit more than six (6) units per "cluster" and delete conversion density percentages as being uniquely inapplicable.

No assertion was made as to any denial by zoning authorities of the claimed grandfathered density.   Rather, appellant merely submitted a request to vary the percentage conversion in the code relating to planned and/or clustered development. This does not translate into any uniqueness caused by the inherent character of the property or the overall density requirement relevant thereto.   In fact, as far as we can discern from the record in this case, for zoning purposes, the property, though perhaps non-conforming, has, through grandfathering, retained its density and single family lot status, *i.e.*, an 186 lot subdivision for detached single family units.

Mr. Whitehill testified before the agency that:

These were single family lots that are below the 15,000 square feet that is now called for in the current zoning.... At that time, an attempt was made in 1976 to have some percolation tests run on these lots....   [T]here were some problems with some of the areas....   At that time ... it was recommended ... that they wait for public sewer....

. . . .

... This project at one time was intended to be an adjunct type community [adjunct to White's Heritage Continuing Care Community] which would be [a] retirement type of a project without the continuing care.   They [the developers] have since changed that....   In the beginning of 1985 McCrone, Inc. did a survey ... with the intent to come up with a new development plan that would offer an alternative to this subdivision ... in hopes of taking the

existing subdivision and replacing it with a planned type of housing style as the new zoning was brought into place. The idea ... was to ... hopefully get a limited development area criteria for the overall property and ... undoing the undo-able, which is a 1959 plat ... and replace[ ] it with a new zoning such as suburban estate zoning *which would have allowed the planned housing styles we seek today by virtue of conditional use.... [S]uburban estate was inapplicable to a recorded subdivision. They couldn't un-record the subdivision ... because they would not have only lost the grandfathering* ... they would have ... to start over.... Professor Lichter here has wrote many letters ... trying to get that LDA designation on the property, and [it] represents one of his few failures.... [I]t was suggested ... that ... we could combine lots ... and go back and reperk the lots. So we made an application.... That was an 88 lot combination plan dated 5/16/89 which was withdrawn. *I hate to lose and so I withdraw these when things are going south on me in the middle of the operation....*

. . . .

... Since that time [1976] we have been making continuous applications to the County ... to amend this property into the master water and sewer plan so we could apply for sewer for the original lots. *Then the nasty, the critical areas designation of RCA* ... [it] did grandfather single family lots which brings us up to our third application ... for ... retirement community rental apartments.... We submitted a concept plan ... that would take this grandfathered density of 186 single family units and convert it to a planned housing style.... We applied to the Planning Commission for approval ... and ... there was a glitch *in the new critical area ordinance....* So this plan ... was withdrawn....

. . . .

... [T]he County proceeded with the rewording of that so that Section 5000 Critical Area Ordinance would be amended to include the other housing styles besides the single

family. The subject of tonight's hearing, now we have moved through nearly a decade of shenanigans.

. . . .

Applicant's Exhibit No. 11 is the biggy. Our application . . . that we were forced to withdraw was basically subject to the conditional use. . . . Section 7203E. refers to . . . the . . . cluster. . . .[1] The first condition . . . asks that the cluster and planned development shall be scattered within surrounding single family homes. These . . . shall not consist of more than 6 units per cluster, nor more than 30% of the dwelling units in any block. This is the section from which we are seeking a variance. . . . *[F]rom the Critical Areas perspective, . . . we are only disturbing 7 acres of land. . . . In order to do this . . . we . . . requested a shore buffer reduction that was granted in a unique fashion. . . . So that anything we granted here would permit the development to be out where the ground is more suitable, which is higher land toward the water, but we would expand the shore buffer for the entire balance of the property. . . .*

. . . .

. . . The requirement of the RCA . . . ties us down to 15% impervious areas in the RCA. . . . [T]he impervious area that we are creating is half of that which is allowed by the Critical Areas RCA designation. [Emphasis added.]

At that point, Mr. Whitehill testified as to various technical aspects of the project and then presented testimony that we shall discuss elsewhere in our opinion. His testimony as to the recorded subdivision plat was merely by way of giving a historical perspective of the land and the various projects proposed therefor. No claim was made below that these previous lots were in any way unique. Moreover, there is no indication that the density he claims was grandfathered has been denied him and, even if the authorities have chal-

---

1. A fair reading of the ordinance indicates that cluster units were originally perceived as low income housing. The conditions as to number and percentages appear to have been intended to limit the amount of such housing in any given neighborhood.

lenged his claim as to grandfathered density—and we find no indication that they have—appellant never requested a variance from any overall density requirement. All of its variance requests concern what it perceives to be necessary to meet the requirements of a change in its development plan from single family to group or cluster living necessitated by the current demand, not of zoning codes, but of environmental regulations (and economic conditions), especially the requirements of complying with the Chesapeake Bay Critical Area regulations. We are not unsympathetic to the plight of a property owner caught between local zoning codes and environmental regulations. We later herein suggest the correct method of addressing this issue. But, an offer to build below density, if a conditional use acceptable to environmental regulators changing the character of the use of the property is granted, does not satisfy the requirement of variance law that the land itself be inherently unique and different from the remainder of the land in the area.

We now continue our discussion of what did occur below. Applicant's Exhibit No. 11 was then introduced with, as we have said, the comment that "No. 11 is the biggy." It is a surveyor's or planner's (unrecorded) plan of the proposed project. Thereafter, Mr. Whitehill testified, initially and apparently referring to the requirements for the granting of conditional uses under the ordinance:

> The first condition of that section asks that the cluster and planned development shall be scattered within surrounding single family homes. These planned developments shall not consist of more than 6 units per cluster, nor more than 30% of the dwelling units in any block.

Mr. Whitehill then noted:

> This is the section from which we are seeking a variance.

He later continued, in relevant part:

> So these units as you are seeing them here are essentially clustered together. These are a planned housing style, apartments are a planned housing style, according to the zoning ordinance in Section 5105.J., that we would have to

provide in order to meet the general zoning criteria for apartments, we would have to provide a lot, if we were to put all these on one lot, that lot would only have to be 6.83 acres. But we actually have a much larger lot than that so we are actually conforming in excess of the minimum lot size that would be required under the zoning ordinance. This plan complies as a condominium project, this plan would comply with the requirements of virtually every planned housing style [and] . . . as a rental project, it . . . will all be privately owned and privately maintained. . . .

Mr. Whitehill then introduced certain exhibits, not relevant to the issues on this appeal, stating that he did so "so we can go into juicier topics which are the variance and conditional use."

Then, continuing his comments, Whitehill noted:

Relative to the conditional use . . . this is where we run into the request for the variance [but then, addressing the conditional use requirements]. If we were doing this in Cloverfields or Harbor View [other neighborhoods] . . . where there are surrounding houses that have already been built and there is an established architectural texture . . . then this special condition of the conditional use would certainly be applicable. At that point you are starting to say that if you take 30% of the dwelling units . . . or 20% . . . unfortunately, within this development itself, . . . there is no architectural, there is nothing there . . . so we find it difficult to apply that particular standard. In Condition 2 . . . we certainly do comply with. Number 3, . . . [s]ame sort of problem, there is nothing . . . that we can compare this to. . . . [S]o we are actually less dense than this would permit. And that the cluster lots shall follow the same standards as village houses, we are not proposing cluster lots. . . . So what we have is kind of an interesting situation. . . . What we find is, by not developing 102 acres, by developing only . . . 7 acres . . . this is certainly more environmentally sound. . . . The single family issue has been resolved so that the grandfathering would be allowed to take those single family lots and convert them to the multifamily and planned housing styles. . . . [D]epending

on the outcome of the conditional use, [we] would like to go in and apply for our sewer....

The following exchange then occurred between Mr. Whitehill and applicant's counsel:

[APPLICANT'S COUNSEL]: ... With regard to the requirements for variances ..., can you advise the Board, in your opinion professionally, whether a literal enforcement of the ordinance would result in unnecessary hardship as a result of the specified conditions[?] [2]

WHITEHILL: Yes, it would, because we have nothing to compare, we have nothing to derive both the housing style ... from, and we have nothing on the basis of the existing architecture ... in this particular instance.

[APPLICANT'S COUNSEL]: Are the conditions that are present on the property peculiar to this property[?]

WHITEHILL: They are very unique to this particular piece of property.

[APPLICANT'S COUNSEL]: Can you tell what they are[?]

WHITEHILL: The uniqueness is ... that this recorded subdivision since 1955 has no houses built in it to establish community character.[3]

[APPLICANT'S COUNSEL]: Can you tell us whether any of the conditions that are present are the result of any action taken by the petitioner....

WHITEHILL: No....

Thereafter, there was some testimony as to the engineering aspects of the project not relevant to the appellate issues at

---

**2.** Mr. Whitehill was not explicitly offered or accepted as an expert on any subject matter, though he purported to have testified before the Board "on a number of occasions over the last 20 years" and did respond to a number of opinion solicitation questions.

**3.** Here, particularly, Mr. Whitehill confuses the standard for conditional uses and variances. The existence *vel non* of houses, while perhaps relevant to conditional uses, is not normally relevant to variances; uniqueness of a particular property is relevant to variances.

bar. The applicant then rested. There were no protestants. Planning and zoning staff then testified in support of the project, stating: "Staff would support the conditional use approval, and we don't have any objection at all to the variance request."

The Board, in its Finding and Decision, noted, first of all, that the County had adopted a new comprehensive plan (zoning map) and zoning ordinance in 1987, which zoned the subject property NC–15, radically departing from the County's previous ordinance; that the County adopted its Chesapeake Bay Critical Area Program in 1988 and its Critical Area Ordinance in 1989; and that the Critical Area maps delineated the subject property as a Resource Conservation Area. Thereafter, an amendment was adopted to the Critical Area Ordinance that provided for a new Section 5000 c modifying density requirements and, in effect, grandfathering in the previous density provisions and resulting in a density of 186 units for the subject property. The Board noted, however, that, in order to avail itself of the 186–unit density, applicant, in addition to satisfying critical area concerns and other environmental matters, or because of those requirements, had to obtain a conditional use to permit clustering.

The conditional use provisions limited the clustering of units to *six units per cluster*, subjected the perimeter of the clustered units to the setbacks of the underlying zoning district, required the dwelling units to be in keeping with the architectural character of the area, and *required the density to be determined in relation to the minimum lot size for the cluster*. All of these conditions had to be met in order for the conditional use to be permitted.

The Board noted that, in addition to the conditional use—or really, in order to qualify to apply for the conditional use—the applicants had to get a variance from the six unit per cluster condition and from the provisions of the density percentages, and additional variances from the conditions for which the ordinance required satisfaction in order to be entitled to a conditional use. In other words, the Board perceived, correct-

ly, that the subject project could not meet the requirements the ordinance established for the granting of the conditional use. Therefore, the applicants were attempting to eliminate the conditions by obtaining variances therefrom.

The attempt to follow this procedure creates fundamental and conceptional problems with the generally accepted proposition that, if the express conditions necessary to obtain a conditional use are met, it is a permitted use because the legislative body has made that policy decision. Does the legislative intent that the use be permitted remain if the conditions are not met but are eliminated by an administrative body granting a variance? Upon such an occurrence, the application for a conditional use becomes dependent upon the granting of the variances. Under those circumstances, the presumption that a conditional use is permitted may well fall by the wayside. The policy that establishes certain uses as permitted is predicated upon the satisfaction, not avoidance, of conditions. Conditions the legislative body attaches to the granting of a conditional use normally must be met in accordance with the statute—not avoided. In any event, even if such a procedure would pass muster, if the variance process fails, the entire application fails.

The Board initially addressed (apparently, presuming for the purposes of its discussion a project in which the variances had been approved) whether the proposed development could meet, even then, the more general requirements of a conditional use. It answered this in the negative, citing the following findings that we perceive to be supported by the evidence:

These districts [Neighborhood Conservation Districts] are intended to preserve the character of the existing neighborhoods.... [T]his area is dominated by single family residential structures and farmland. [T]he ... Ordinance clearly intend[ed] that the character of the existing neighborhood was to be preserved.... Clearly, the Applicant envisions an apartment complex in an area where apartments do not exist.

The Board then noted that which we have indicated above, "[a]pplicant not only wants the Board to grant a conditional use, but also to totally ignore the express conditions attached to that conditional use [*i.e.,* combining the application with a request for a variance in order to remove the express conditions]." It then found that such a conditional use would permit the area to be dominated by the proposed apartment complex, despite the fact that apartments do not now exist in the neighborhood. Thereafter, the Board addressed other general conditions, the consideration of which is required in cases of requests for conditional uses, and extensively discussed the testimony and evidence in regards to, *inter alia,* traffic, harmony, purpose and goals of the ordinance.

■ We do not choose to review each challenged evidential inference made by the Board. The Board properly denied the variances, penultimately, because of the abject failure of appellant to produce evidence (as opposed to non-expert opinion) meeting the essential elements required for obtaining variances in the first instance. We hold that the Board's findings and decisions arising out of its consideration of the general and special conditions, and Judge Wise's well-considered opinion affirming the Board's decision, were correct.

■ The only evidence proffered in support of showing the property's "uniqueness," a showing essential to the grant of the requested variances, was Mr. Whitehill's testimony that it was unique. His testimony in this regard can be paraphrased as "it is unique because the property owner can't do what he wants to do," *i.e.,* that the proposed property was unique because it had no existing houses thereon to which the proposed cluster units could be compared. That position has been consistently rejected as a reason to grant variances by the appellate courts of this and most foreign jurisdictions.[4]

---

**4.** The fact that nothing existed on nearby properties to which a comparison of the proposed cluster units can be made is proof that the instant property in its unimproved state is, for variance purposes, similar, not dissimilar or unique in respect to the neighboring properties. In any

■ We recently discussed the issue of the grants and denials of variances in our case of *Cromwell v. Ward,* 102 Md.App. 691, 651 *A.*2d 424 (1995). We there described the initial and essential first step in the determination of the appropriateness of an area variance:[5] the subject property must be so inherently unique that the ordinance's impact thereon would be disproportionate when compared to other lands in the district. *See, generally,* our decision in *Cromwell* for a full and complete discourse on the subject of variance law.

In the case *sub judice,* not one minute speck of evidence was produced indicating that this property is inherently unique as compared to other properties in the area or that the zoning ordinance's impact on other properties in the neighborhood, area, or district was in any way different than its impact on the subject property. The evidence was to the contrary. It may be that other similar properties in the vicinity are not affected by the stringent requirements of critical area legislation, and it may be, though we do not now so hold, that, if only one property in a neighborhood is subject to stringent environmental restrictions, that property may be unique for variance purposes. That, however, is an issue for another case, or for the legislature, or regulators. In the case *sub judice,* there is no factual predicate therefor.

We said in *Cromwell:*

[T]he *variance* process ... is at least a two-step process. The first step requires a finding that the property whereon structures are to be placed (or uses conducted) is—in and of itself—unique and unusual in a manner different from the

---

event, that was only one of the mandatory conditions that had to be met in order for a conditional use to be granted.

**5.** The variances requested were specific area variances needed in order to remove conditions statutorily attached to the conditional use sought. Had appellant attempted to get a variance (as opposed to a conditional use) in order to develop the whole project as proposed, the change from single family to retirement apartments, would have also involved a "use" variance.

nature of surrounding properties.... Unless there is a finding that the property is unique, unusual, or different, the process stops here and the variance is denied....

Opinion, at 694, 651 A.2d at 426. We concluded in *Cromwell:*

There was no evidence submitted to the Board that the subject site was in any way peculiar, unusual, or unique when compared to other properties in the neighborhood such that the ordinance's ... restriction's impact upon the subject property would be different than the restriction's impact upon other neighboring properties. In essence, the impact would be the same. The first step of the variance process was thus not met.

Opinion, at 726, 651 A.2d at 441.

There was little, if any, evidence presented below as to differences, if any, between other properties in the neighborhood (or area or district) and the subject property. Presumably, the provisions of the zoning ordinance would similarly impact on such nearby properties. We note, as we did in *Cromwell,* that

the variance that is desired (and the difficulties that would exist if it is not granted) cannot be the source of the first prong of the variance process—an inherent uniqueness of the subject property not shared by surrounding properties.

Opinion, at 695, 651 A.2d at 426.

In the case *sub judice,* unlike the zoning authorities in the *Cromwell* case, the zoning entity—the Board of Appeals— displayed an understanding of the variance process and applied that understanding as they were required to do, denying the variance. That denial was legally correct. Given the failure of the request for a variance, it was impossible for appellants to comply with the specific conditions with which the ordinance required compliance before a grant of a conditional use could be made, even if such conditions could legally be avoided by variance. Thus, in addition to failing to meet the general conditions necessary for the approval of a conditional use, appellants also failed to meet the specific conditions. The Board did not err; its actions were not arbitrary

and capricious. It correctly rejected the applications for the conditional use and the variances.

 Before concluding, we have two observations. First, the professional staff abdicated its responsibility in its role in respect to conditional uses and variances. It recommended favorably that, which, if granted, would have been clearly illegal and arbitrary. We can understand, however, that, in areas where severe environmental regulation, *i.e.*, critical area regulations, overlay zoning regulations, the two statutory schemes can be in irreconcilable conflict. What is permitted by one scheme may be prohibited by the other. When that occurs—and it may well have occurred here—we perceive that there can exist extreme pressure within the staff to attempt to reconcile the irreconcilable. While the desire to rectify the problem is understandable, planning staff should not put itself in a position, or allow itself to become so positioned, of recommending that which the zoning code prohibits. The problems that may exist in the interplay between environmental and zoning regulations may well call for legislative attention. It is not, however, the function of staff to make such policy decisions in the absence of legislative action. We do not perceive that it was the legislative intention in passing the State or local critical area legislation that zoning variance procedures would be prostituted in order to alleviate the harshness of environmental regulation. If that is the intention of the legislative entities, they have the power to express clearly that intention. It may well be that the legislature should direct its attention to amending the variance provisions of Art. 66B to include the effect of subjection to environmental regulations as a unique quality of property so as to enable local jurisdictions to provide by ordinance for such consideration. It may be that charter counties need to consider amending their ordinances to allow environmental regulatory impact to be considered as an appropriate reason for the granting of a variance. Until the appropriate legislative bodies make that consideration, zoning entities lack the administrative authority to broaden, by *ad hoc* administrative acts, the power they possess to grant variances.

Second, we wish to note that Judge Wise, in his opinion and affirmance of the Board's decision, displayed a complete understanding of the nature of the zoning variance and conditional use law and procedure. His decision was correct.

■ We conclude by noting that appellant further asserts that, because the Queen Anne's County's ordinance contains both the unnecessary hardship standard and an extraordinary hardship standard, the County must have intended to equate unnecessary hardship to practical difficulty. We do not agree. The only standards in Queen Anne's County are those that have been stated. They do not include practical difficulty. Thus, even in area variance issues, the stringent unnecessary hardship standard applies. In use variances (if same are even permitted under the Queen Anne's County ordinance), the seemingly even more stringent extraordinary hardship would apply. *See Cromwell, supra.* In that respect, the Queen Anne's County ordinance is a tough ordinance.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**