685 A.2d 454

**Robert S. EVANS**

v.

**SHORE COMMUNICATIONS, INC., et al.**

**No. 907, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Nov. 27, 1996.

286

Sidney S. Campen, Jr. (Campen & Walsworth, P.A., on the brief), Easton, for appellant.

John P. White, Easton, for appellees.

Argued before MURPHY, C.J., and WENNER and DAVIS, JJ.

DAVIS, Judge.

Robert S. Evans appeals from the judgment of the Circuit Court for Talbot County, which had reversed the decision of the Talbot County Board of Appeals denying a special exception and variance for the construction of an antenna tower. Shore Communications, Inc. and Mark Sapperstein, through their agent John H. Plummer & Associates, Inc., had filed a petition with the Talbot County Board of Appeals (Board), seeking to secure a special exception to construct a communications tower to the height of 200' and a variance to add an additional 100' of height to the tower. The Board denied the special exception request by a three-to-two vote and the variance was denied by unanimous vote. Petitioners then noted an appeal to the Circuit Court for Talbot County.

The testimony taken during the hearing before the Board was lost by virtue of an equipment malfunction, necessitating the filing of a stipulation by the parties to the testimony pursuant to MARYLAND RULE 7–206(b).

The circuit court, after hearing oral argument, affirmed the Board's decision to deny the variance, but reversed the Board with respect to the special exception. The court then remanded the case to the Board to grant the special exception to construct the proposed 200' tower.

Evans noted an appeal to this Court and appellees noted a cross-appeal from the circuit court's affirmance of the Board's decision to deny the variance. The parties elected to proceed by way of an expedited appeal pursuant to MARYLAND RULE 8–207. They present the following two questions for our review, restated as follows:

I. Did Petitioners carry their burden of proof and persuasion before the Board regarding the substantive criteria required by the Talbot County Zoning Ordinance for the granting of a special exception to construct a 200' communications tower and, if so, was the evidence produced in opposition sufficient to make the issue fairly debatable?

II. Did Petitioners carry their burden of proof and persuasion before the Board regarding the substantive criteria required by the Talbot County Zoning Ordinance for the granting of a variance to increase the height of the proposed communication tower 100' above the 200' special exception limits and, if so, was the evidence produced in opposition sufficient to make the question fairly debatable?

## FACTS [1]

The Board's public hearing on October 2, 1995 regarding Petitioners' Applications was attended by many persons from the neighborhood of the site of the proposed communication tower, most of whom opposed the erection of the proposed tower whether it reached to the 300' height requested by the variance or the 200' height requested by the special exception. In support of its Applications, Petitioners introduced four witnesses and numerous exhibits depicting the character of the neighborhood, the site of the proposed tower, views of other existing towers in Talbot County, a list of previously granted special exceptions for towers and tower height variances, design drawings of the proposed tower, various letters from public agencies favoring the proposed tower, a qualified expert real estate appraiser's report concluding that the proposed tower will not diminish neighboring property values, various published industry reports relating to health and safety issues and radio frequency electromagnetic fields associated with communication

---

1. We reproduced the agreed statement of facts verbatim since, pursuant to MARYLAND RULE 8–207, our review herein is based exclusively on that statement of facts in lieu of a record extract.

towers and an FAA [Federal Aviation Administration] acknowledgement of notice of receipt of the proposed construction of the tower.

Mark Sapperstein was produced by Petitioners and testified as follows:

He is one of the Petitioners and the President of Shore Communications, Inc., the other Petitioner.

Shore Communications, Inc. ("SCI") is a corporation engaged in constructing a network of radio communication towers on the Eastern Shore of Maryland. The network of towers will be utilized by various private and public companies involved in the transmission of radio communication signals for use by cellular telephones, paging devices and other similar radio transmission equipment. SCI has also built towers in several locations on the Western Shore.

Mr. Sapperstein testified regarding all aspects of the substantive criteria required by the Zoning Ordinance of Talbot County ("ZOTC") as conditions for approval of special exceptions and variances. He testified that the location of the proposed tower was chosen so it would not be within three (3) miles of any other tower in the county, a prohibition created by § 19.4 of the Zoning Ordinance. The request for the variance was required because of the 200' height limitation for communication towers as set forth in § 19.10(x)(1)(IV) of the Zoning Ordinance.

The proposed tower will be erected on the land of Fred Johnson located at the intersection of Longwoods Road and U.S. Route 50, slightly north of Longwoods. The location of the property is shown on several exhibits presented by Petitioners and admitted as Petitioners' Exhibit Nos. 1,2,8 and 9. This location was also chosen because (1) it will be able to serve the most useful purpose in the network of other towers utilized by the communication companies seeking use of Petitioners' proposed tower; (2) the chosen site is the highest elevation in the general area which allows the tower height to be reduced from that which would be required if constructed on a lower elevation; (3) the proposed location is nearly equidistant from two nearby village

centers, Skipton and Longwoods, which are relatively dense residential areas; (4) the proposed location is adjacent to a dense grove of tall trees which will create a visual buffer of the lower portion of the tower on its west side; (5) the proposed location is adjacent to Maryland State Route 50, a heavily-traveled four lane highway where property values will least likely be affected and residential activity least interrupted; and (6) the proposed location is adjacent to existing electric power lines running parallel to Maryland Route 50 and rising over 100' in height, thus reducing the visual impact of the height of the proposed tower on the neighboring properties.

The tower will be a 3–legged, free-standing lattice-type metal tower constructed in accordance with the design concepts displayed on Petitioners' Exhibits No. 7 and No. 20. Exhibit No. 20 is a photograph of a tower similar to the one proposed which is located near Wye Mills, Maryland. Petitioners' Exhibit No. 7 is an engineered design drawing showing the proposed construction features of the tower. The structure will be set in a concrete base buried deep in the earth. There is no risk that the tower will tip over.

The proposed site of the tower is a five acre+/parcel of agricultural use land which will be leased by Petitioners from Fred Johnson. The tower will utilize a very small portion of the parcel for a building pad approximately 100' × 100' where the tower and three equipment buildings will be constructed. The pad will be improved by a chain-link fence for security purposes. Plantings will be placed around the exterior of the fence as a visual buffer. The buildings will house various appurtenant equipment required for transmission and receipt of radio signals. The tower and buildings will be accessed by a private farm lane leading from the Longwoods public road and located entirely on the rented parcel. It will not be open to public use.

Mr. Sapperstein used Petitioners' Exhibit No. 1, an aerial photo of the neighborhood, to point out the location of the proposed tower relative to various landmarks and homes owned by persons opposing the Application. The exhibit

clearly depicted the character of the neighborhood and showed the Village of Longwoods as well as the home of Respondent, Robert Evans.

Petitioners' Exhibit No. 9 was introduced to show the location of the proposed tower as being in an RAC [Rural/Agricultural Conservation] zone where it is permitted as a special exception. The proposed site will not be in an area protected by the critical areas or non-tidal wetlands regulations.

Mr. Sapperstein testified that locating the tower near U.S. Route 50 would produce the optimum performance for transmission of the radio signals and would be least interruptive of residential and agricultural uses in that area of the County.

The tower will be inspected and maintained by Petitioners' personnel on a periodic basis. It will bear such lighting fixtures as the U.S. Federal Aviation Administration ("FAA") may require for assuring the safety of the tower and passing aircraft. There will be moderate lighting provided at the base of the tower for the convenience of Petitioners' personnel inspecting the tower at night. The entry gate to the pad site will be locked at all times when personnel are not on site. The premises will be secured from intrusion by trespassers by a chain-link fence and an alarm system.

Three communication companies have currently subscribed for space on the tower. It will have the potential of accommodating three other users for a total of six users.

Mr. Sapperstein introduced Petitioners' Exhibit No. 3 which is a "Path–Pro" diagram displaying a gap in transmission coverage for one of the subscribing users which is transmitting signals in Talbot County. The diagram also shows the curative effect if the proposed tower is permitted. He explained that the location of a tower in a network scheme such as is being organized by Petitioners is a very delicate process which must accommodate the needs of the several users of the tower as well as complying with the Zoning Ordinance prohibition against locating a tower any

closer than three (3) miles to an existing tower. The location proposed for the tower will accommodate the needs of various state and local agencies such as the Emergency Management Agency and the Emergency Medical Services.

Mr. Sapperstein described the nature of the radio waves that will be transmitted and received by the equipment mounted on the tower. He introduced Petitioners' Exhibits No. 16, 17 and 19, representing various articles describing radio frequencies and answering questions regarding interference with television reception. He explained that there will be no potential for explosion or fire resulting from the equipment kept on the premises because the electrical energy levels of the equipment are very low. There would be no propensity for endangerment of public health or safety resulting from construction of the tower because the tower will be located in the center of the 5–acre parcel allowing ample clearance of safe distance for tipping or breaking should either occur, however unlikely.

Use of the tower by local agencies will enhance the performance of the local police and fire companies and other public services which depend on radio transmissions during the performance of their duties.

There will be no requirement for water and sewer service to the premises. There will be no special requirement or burden placed on local police or fire agencies to secure or protect the premises. Access to the premises from Longwoods Road will be by a private lane and Petitioners' personnel will visit the premises infrequently so there will be no adverse impact on pedestrian or vehicular traffic using Longwoods Road or U.S. Route 50. The type of vehicular traffic using the lane will not be such as to cause any nuisance effects such as dust, noise or vibration.

There are several other towers in the County which exceed the 200' height limit. He explained that although the mere fact that there are other towers exceeding 200' does not justify the granting of the variance in this case, the very existence of other towers exceeding the 200' limit, strongly suggests that the legislated limit of 200' is flawed

and not reasonable under the circumstances of today's communication requirements.

He also testified that he did not believe that granting a variance in this case would confer upon Petitioners any special privilege not enjoyed by others in the same zone because the County Council will recognize soon that it must increase the allowable height of communication towers to avoid a proliferation of towers resulting from the steady increase in demand for this quasi-public utility service.

He also testified that the requested variance is not the result of any conditions or circumstances which result solely from Petitioners' actions. The need for the variance results from the general public's increasing demand for more communication service on the one hand, and the strict limitation of one tower per three (3) mile radius. With the potential number of towers in the County limited by the three (3) mile regulation, the only means of fulfilling the demand for space to mount transmission equipment is to extend the towers beyond the 200' limit.

According to Mr. Sapperstein, the granting of the variance will have no adverse effect upon water quality or impact on fish, wildlife or plant habitat located in the vicinity of the proposed tower.

Finally, Mr. Sapperstein opined that the County Council had arbitrarily created an unrealistically low height limit on these towers because that limit will not necessarily serve or protect any public interest or prevent any potential harm to the public at large. If aesthetics is the motivation for the 200' limit, the limit chosen would seem meaningless when it is recognized that an increase of 100' on an existing 200' tower will cause an insignificant increase of visual impact.

Fred Johnson was produced by Petitioners and testified as follows:

He is the owner of the property upon which SCI proposes to construct its communication tower and that he has leased the five acre parcel to SCI for that purpose. His personal home is located adjacent to the proposed site of the tower

and he has no objection to the tower as proposed. He candidly testified that had he known there was going to be so much opposition from the people in the community, he would not have leased his property for this purpose.

Eugene Bidun was produced by Petitioners and testified as follows:

He testified that he is the Director of the Maryland Institute for Emergency Medical Services System which is located in Baltimore, Maryland. His agency is responsible for all hospital-to-ambulance and medivac communications in the State of Maryland. His agency has had the privilege of utilizing free space on towers constructed by Petitioners throughout the State of Maryland. He confirmed that he wrote to the Board recommending that the proposed tower be allowed at the 300' height so that his agency will receive better service in the north and east portions of Talbot County. He described his familiarity with Petitioners' networks and described their services as being dependable and beneficial to his agency and to the community at large.

William Kleppinger was produced by Petitioners and testified as follows:

Mr. Kleppinger was accepted by the Board as an expert witness on real estate appraisal matters. He introduced a report prepared by himself dated September 24, 1995 which analyzes and describes the impact the proposed tower will have on the value and use of properties located in the near vicinity of the proposed tower. He also introduced various photographs which he took of towers located in Talbot County. In his opinion, the towers located elsewhere in the County have had no negative impact on adjoining property values. He concluded that Petitioners' communication tower at the proposed site will have no adverse effects on real estate values in that neighborhood above and beyond the effect that is inherently associated with the location of a tower such as this any where in the RAC zones of the County.

The following exhibits were introduced and received in evidence by the Board on behalf of Petitioners:

● Aerial photograph of the site and neighborhood.

● Map of Talbot County.

● Chart showing coverage of signals from tower.

● Letter dated August 4, 1995 from the Director of the Maryland Institute for Emergency Medical Services System to the Board of Appeals.

● Design drawing of proposed tower. (Same as Board's Exhibit No. 11).

● Copy of Chart from Talbot County Comprehensive Plan showing location of proposed tower.

● Copies of Chart showing the site of proposed tower in the RAC zone.

● Consultant's report prepared by Mid Shore Appraisal Services dated September 24, 1995.

● Listing of previous special exceptions and variances granted by the Board for communication towers.

● Letter dated September 29, 1995 from John H. Plummer, President, John H. Plummer & Associates, Inc., to the Board of Appeals indicating that in connection with this application he is acting as the authorized agent of Shore Communications, Inc. and the property owners.

● Mounted photographs showing other towers existing in Talbot County.

● Photocopy of a report concerning health and safety issues related to radio frequency electromagnetic fields emitted by communications towers similar to the one proposed by Petitioners.

● Photocopy of a report concerning the potential for television reception interference from communications towers.

● Acknowledgement from the Federal Aviation Administration of receipt of a Notice of Proposed Construction of the proposed tower.

● Photocopy of a report indicating that exposure to radio frequency energy from a tower similar to the one proposed by Petitioners is below the maximum permissible

exposure set by the American National Standards Institute.

● Chart indicating the relative power levels emitted form [sic] various types of towers, ranging from UHF television towers to Cellular towers.

Thomas Wyman, a nearby property owner, requested the Board to be allowed to comment on Petitioners' Application. He indicated that he had obtained signatures on a Petition from approximately fifty people in the Longwoods area, all in opposition to the tower. The Petition was submitted to the Board as Protestants' Exhibit 1 over the objection of Petitioners' counsel. The Petition pointed out that the TCZO does not permit antenna towers in excess of 200' as requested by Petitioner. Mr. Wyman indicated that he was opposed to the tower because of the FAA required lighting and the impact of a 300' tower on property values and the scenery in this area of large and expensive farms in an RAC Zone. Also, Mr. Wyman stated that Petitioner had not demonstrated a need for the proposed tower.

William Callahan, farm manager for Robert Bell, Forest Landing Farm, a 1,000 acre estate, requested the Board to be allowed to comment on Petitioners' Application. He stated that he and Mr. Bell were opposed to it because the lights (especially required strobe lights that blink at night) on a nearby tower could not be shielded due to FCC requirements, which would create a nuisance from their prospective.

Charles Ted Taylor, a nearby property owner, requested the Board to be allowed to comment on Petitioners' Application. He voiced his opposition to the tower as being unsightly in the rural estate setting of the area and that he felt it would impact adversely on property values. Mr. Taylor also suggested that there are currently an adequate number of antenna towers in Talbot County.

Theresa Newman, a nearby property owner, requested to be allowed to comment on Petitioners' Application. She was opposed to the tower. She stated that one cannot landscape a tower and that it would be unsightly from her prospective

[sic] in a very scenic area of the county adjacent to U.S. Route 50.

John Roselius, farm manager for Robert Evans, owner of the nearby Winter Run Farm, was produced by Respondent and testified as follows: He stated that they operate a very complex and extensive horse breeding operation on nearby Winter Run Farm, which was chosen by Mr. Evans for horse breeding due to its natural and quiet rural setting. He stated that the tower would not only destroy the scenery and character of the area, but will disrupt their horse breeding operation due to the very temperamental nature of thoroughbred horses when subjected to such changes, as the introduction of blinking lights all night on a communications tower. He said such lights would bother mares in fold [sic] and cause a loss of revenue to Mr. Evans. Also, Mr. Roselius stated that property values would most assuredly be affected by the tower and finally that he frequently used his cellular phone at all hours and had experienced no problems with communications in the area.

Mr. Roselius testified that he had moved here from Wyoming to conduct the horse breeding operation and reminded the Board that once scenic areas such as this are lost, they cannot be recovered in the future.

At the conclusion of the hearing, Respondent, Robert Evans, through counsel, presented a Memorandum in Opposition to the Request for Special Exception and Variance which pointed out that the general purpose of the Zoning Ordinance is to preserve the existing rural character and quality of life of Talbot County and that the location of the proposed tower is squarely within one of the more rural and estate areas of the County, having been zoned RAC (Rural/Agricultural Conservation). Under the Ordinance, any development in this district must conserve and protect agricultural lands and preserve the rural character of the County through the conservation of open space and agricultural lands as required by the qualitative mandate of the Comprehensive Plan.

Finally, the Memorandum called attention to the jurisdictional limitation on the authority of the Board. The Ordinance specifically states that the Board may not legalize any violation of the Ordinance (e.g., a tower in excess of 200') nor may the Board amend or change the Zoning Ordinance or Zoning Maps (Sec.19.14(b)(5)). A 300' tower in the RAC Zone clearly exceeds the limitation of authority of the Board in this case.

The Board permitted cross-examination of witnesses by counsel for the respective parties.

## STANDARD OF REVIEW

We said recently in *Umerley v. People's Counsel*, 108 Md. App. 497, 672 A.2d 173, *cert. denied*, 342 Md. 584, 678 A.2d 1049 (1996) that

> [t]he order of a county zoning authority "must be upheld on review if it is not premised upon an error of law and if [its] conclusions 'reasonably may be based upon the facts proven.'"

*Id.* at 503, 672 A.2d 173 (quoting *Ad+Soil, Inc. v. County Comm'rs of Queen Anne's County*, 307 Md. 307, 338, 513 A.2d 893 (1986)). In chronicling other guiding principles regarding the review of an order of a county zoning authority, we noted that the zoning authority must properly construe controlling law (citing *Montgomery County v. Merlands Club, Inc.*, 202 Md. 279, 287, 96 A.2d 261 (1953)); that the action of the zoning authority is "fairly debatable" if based on substantial evidence (citing *Northampton Corp. v. Prince George's County*, 273 Md. 93, 101, 327 A.2d 774 (1974)); and that the fairly debatable test "accords with the general standard for judicial review of the ruling of an administrative agency, which [is] defined as 'whether a reasoning mind reasonably could have reached the factual conclusion the agency reached; this need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment.'" (citing *Board of County Comm'rs v. Holbrook*, 314 Md. 210, 218, 550 A.2d 664 (1988)). We noted that in *Ocean Hideaway Condominium Ass'n. v.*

*Boardwalk Plaza Venture,* 68 Md.App. 650, 665, 515 A.2d 485 (1986), we had held that the zoning authority decision was not fairly debatable, and thus was "arbitrary, capricious and a denial of due process of law" because there was no substantial evidence to support the factual findings of the zoning authority.

We held, in *Umerley,* that the application of the standards of review set forth required a three-step analysis enunciated by us in *Comptroller v. World Book Childcraft, Int'l, Inc.,* 67 Md.App. 424, 508 A.2d 148, *cert. denied,* 307 Md. 260, 513 A.2d 314 (1986):

1. First, the reviewing court must determine whether the agency recognized and *applied the correct principles of law governing the case.* The reviewing court is not constrained to affirm the agency where its order "is premised solely upon an erroneous conclusion of law."

2. Once it is determined that the agency did not err in its determination or interpretation of the applicable law, the reviewing court next examines the agency's factual findings to determine if they are *supported by substantial evidence, i.e., by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion....*

3. Finally, the reviewing court must examine how the agency applied the law to the facts. This, of course, is a judgmental process involving a mixed question of law and fact, and *great deference must be accorded to the agency.* The test of appellate review of this function is *"whether, ... a reasoning mind could reasonably have reached the conclusion reached by the* [agency], consistent with a proper application of the [controlling legal principles]."

*Id.* at 438–39, 508 A.2d 148 (emphasis added, citations omitted).

## LEGAL ANALYSIS

### I

 With these principles in mind, we turn to the case *sub judice.* Section 19.14(b)(4) of the Talbot County Zoning Ordinance provides:

Special Exceptions

(i) Purpose. Certain land uses by their very nature tend to be incompatible with other land uses in the same land use district but may be found acceptable in certain circumstances when conditioned in a manner to protect abutting land owners and to preserve the character of the area. Special exception uses listed in the general table of use regulations by zoning districts § 19.14 of this Ordinance may only be approved following a review and recommendation by the planning commission and final approval and authorization after a public hearing before the board of appeals. Special exception uses within the critical area may only be approved by the board of appeals after receipt of notification by the Chesapeake Bay Critical Area Commission.

Appellant concedes that antenna towers are permitted by special exception in RAC (Rural/Agricultural Conservative District), notwithstanding their inherent deleterious effects. He contends, however, that the Board may consider the cumulative deleterious effect of too many towers on the issue of the intent of the Comprehensive Plan to preserve and conserve agricultural lands and the rural character of Talbot County. Appellant argues that that consideration is the central issue in this appeal. In support of his position, appellant cites *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981), *Prince George's County v. Brandywine*, 109 Md.App. 599, 675 A.2d 585, *cert. granted* 343 Md. 566, 683 A.2d 178 (No. 74, Sept. Term, 1996, filed October 19, 1996), *Mossburg v. Montgomery County*, 107 Md.App. 1, 666 A.2d 1253 (1995), *cert. denied sub nom. Twin Lakes Citizens v. Mossburg*, 341 Md. 649, 672 A.2d 623 (1996), as standing for the proposition that a use permitted by special exception in a given area may reach a threshold by virtue of the preexisting saturation of that same use at that location as opposed to elsewhere in the subdivision.

Appellees contend that the Board's role was limited to that of a fact finder applying the policies and standards set forth by the county council and the ordinance and that a finding that the proliferation of towers "results in a loss of scenic

views which characterize the county" was a usurpation of the legislative role properly granted to the council. In support of their contention that the county council has addressed the issue of aesthetics and tower proliferation, appellees cite the table of use regulations, § 19.4(a), where under the designation, "Radio Communications," the table provides that "new antenna towers shall not be located within a 3 mile radius of any existing antenna towers in the unincorporated area of the county." Appellees further invite our attention to § 19.14(b)(6) of the Zoning Ordinance entitled "Limitation of Authority of the Board of Appeals," subsection (ii) (apx.7) which provides that "the Board of Appeals shall not amend any of the provisions of the ordinance....".

Appellees conclude that any decision regarding the distance between the proposed tower and existing towers was a transgression by the Board on the proper legislative function of the council and, hence, beyond the Board's authority. The decision by the Circuit Court for Talbot County to remand the case to the Board with instructions to grant the special exception was based on the court's determination that "... [t]he proliferation of the towers is not a proper province of the Board." The only other basis given by the lower court for remanding the case with instructions to grant the special exception is the court's determination that the conclusions of the Board could not have been reasonably based upon the facts before the Board. Of course, we must review the action of the Board in the same manner in which the circuit court conducted its review of the Board's decision. *Mortimer v. Howard Research and Dev. Corp.*, 83 Md.App. 432, 442, 575 A.2d 750, *cert. denied*, 321 Md. 164, 582 A.2d 499 (1990).

The Court of Appeals said in *Schultz*, 291 Md. at 11, 432 A.2d 1319:

This Court has frequently expressed the applicable standards for judicial review of the grant or denial of a special exception use. The special exception use is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and

therefore, valid. The special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible *absent any fact or circumstance negating the presumption.* The duties given the Board are to judge whether the *neighboring properties in the general neighborhood would be adversely affected* and whether the use in the particular case is in harmony with the general purpose and intent of the plan.

Whereas, the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements, he does not have the burden of establishing affirmatively that his proposed use would be a benefit to the community. If he shows to the satisfaction of the Board that the proposed use would be conducted without real detriment to the neighborhood and would not actually adversely affect the public interest, he has met his burden. The extent of any harm or disturbance to the neighboring area and uses is, of course, material. If the evidence makes the question of harm or disturbance or the question of the disruption of the harmony of the comprehensive plan of zoning fairly debatable, the matter is one for the Board to decide. But if there is no probative evidence of harm or disturbance in light of the nature of the zone involved or of factors causing disharmony to the operation of the comprehensive plan, a denial of an application for a special exception use is arbitrary, capricious, and illegal.

*Id.* (emphasis added, citations omitted).

Ultimately, the *Schultz* Court held:

... the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently

associated with such a special exception use irrespective of its location within the zone.

*Id.* at 22–23, 432 A.2d 1319 (citations omitted).

 The question of whether the proliferation of towers in the rural areas of the county was a matter properly within the province of the Board will not detain us long. The language of *Schultz* makes clear that a special exception is a valid zoning mechanism that delegates only limited authority to an administrative board to determine the use to be permissible in the absence of any fact or circumstances that negate the presumption. The county council has already legislatively determined, by designating the use as a special exception, general compatibility with the other uses in the zone. *See Mossburg,* 107 Md.App. at 8, 666 A.2d 1253. The council, having already determined that no antenna tower shall be located within a three-mile radius of any existing tower, has made a zoning decision delineating where additional antenna towers may be located. The only authority delegated to the Board was a determination of whether the general neighborhood would be adversely affected and whether the use was in harmony with the general purpose and intent of the Comprehensive Plan. *Schultz,* 291 Md. at 11, 432 A.2d 1319. We hold, therefore, that the lower court properly remanded the case to the Board because it relied on the proliferation of towers as its basis for denying the special exception.

Although we are obliged to conduct our own examination of the Board's ultimate decision and the findings of fact in support thereof, we note that the trial judge decided that the Board's conclusions could not have been reasonably based on the facts before it and ordered the Board to grant the special exception. A review of the parties' agreed statement of facts reveals that the objections lodged by neighboring property owners focused primarily on a perceived diminution of property values. There was further opposition because of the lighting required by the FAA; in one case, the lighting was feared to cause a loss in revenue because of the effect on mares in foal on a neighbor's horse breeding farm. There was also a

claim that the tower would be unsightly in the rural estate setting and would destroy the scenery and character of the area.

Counsel for appellant, according to the agreed statement of facts, pointed out in a memorandum submitted to the court, "that the general purpose of the Zoning Ordinance is to preserve the existing rural character and quality of life of Talbot County and that the location of the proposed tower is squarely within one of the more rural and estate areas of the County, having been zoned RAC (Rural/Agricultural Conservation)." Obviously, the memorandum correctly sets forth one of the purposes of the Comprehensive Plan; however, a conclusory statement by counsel does not provide a factual basis upon which the Board can render a decision as to the grant or denial of a special exception.

With respect to the adverse impact on the surrounding area, appellees assert that any glare from the FAA required lighting would not necessarily constitute an adverse impact. John Roselius, manager of a nearby farm, claimed that the blinking lights all night on a communications tower would disrupt the horse breeding operation because of the temperamental nature of their horses. According to appellees, FAA regulations do not require lights on towers 200' or less in height, a fact that we are unable to divine from the record before us.[2]

Assuming, *arguendo*, that appellant has produced evidence that the tower will result in an adverse impact on the surrounding properties, the Board was nevertheless obliged to make a finding that the adverse effects would be greater in the proposed location than they would generally be elsewhere within the areas of the county where they may be established. *Schultz*, 291 Md. at 22–23, 432 A.2d 1319. Such a finding was not made by the Board.

---

**2.** Obviously, even if the FAA requirements applied to towers in excess of 200' in height, the proceedings before the Board sought the grant of a variance for the 300' tower as well as a special exception for the 200' tower and thus the FAA lighting requirement for towers in excess of 200' would have been relevant.

■ Finally, the Board concluded that the proposed use was not compatible with the pattern of existing developed land use in that "the proposed tower is unique to the pattern of existing developed land use in the vicinity." The Board opined that the tower would be detrimental to the use of nearby residents in terms of the use and enjoyment of the rural character of their property. Clearly, the section of the Comprehensive Plan titled, "Rural and Agricultural Conservation Areas," provides for conservation of the rural and agrarian character of the area in the face of expanding suburban and residential development. The Board fails to state how construction of the tower in question undermines the rural character of the neighborhood and somehow transforms the area into a neighborhood antithetical in character to that of a rural neighborhood. The uniqueness referred to by the Board must be in terms of adverse effects and the adverse effects must be above and beyond those inherently associated with the location of a special exception use any where else within the zone. *See Deen v. Baltimore Gas & Electric Co.,* 240 Md. 317, 331, 214 A.2d 146 (1965); *Mossburg,* 107 Md.App. at 24–25, 666 A.2d 1253.

While it appears that the Board reached the wrong conclusions based on the facts before it, we believe that, had it applied the correct standard, the only proper decision it could have reached on the evidence before it would have been a grant of the special exception. We affirm the trial court's remand for the Board to grant the application for special exception and instruct the Board to apply the proper legal standard to the evidence.

## II

■ Appellee, Shore Communications, Inc. (SCI), cross-appeals [3] from the judgment of the circuit court, arguing that the Board of Appeals arbitrarily and capriciously denied a variance for a 300' tower. Again, the issue is whether the question before the Board was fairly debatable; i.e., if, in applying the correct legal standard, the decision of the Board " 'is supported by substantial evidence on the record taken as

---

**3.** Reference to SCI pertaining to cross-appeals shall hereafter also include in such designation cross-appellant Sapperstein.

a whole.'" *Moseman v. County Council of Prince George's County,* 99 Md.App. 258, 262, 636 A.2d 499, *cert. denied,* 335 Md. 229, 643 A.2d 383 (1994) (citations omitted). "In determining whether there was substantial evidence to support the agency's decision, if there was evidence from which a reasonable person could come to different conclusions, this Court will not substitute its judgment for that of the administrative agency, even if we might have reached a different conclusion independently." *Id.*

Section 19.14(b)(3) contains the provisions governing variances in Talbot County. It reads, in pertinent part:

Variances

(i) Purpose. A variance from the quantitative numerical requirements of this Ordinance may be granted by the Board of Appeals in specific cases if such a variance would not be contrary to the public health, safety, or welfare, and if there are special conditions such as site features or other circumstances not created by the property owner, and if a literal enforcement of the provisions of this Ordinance would result in undue hardship to the property owner. A variance from the qualitative policy requirements of this Ordinance may not be requested.

(ii) An application for a variance ... must demonstrate that the criteria set forth in [a] through [e] below, have been met.

[a] Special conditions or circumstances exist that are peculiar to the land or structure such that a literal enforcement of the provisions of this Ordinance would result in unwarranted hardship to the property owner;

[b] A literal interpretation of this Ordinance will deprive the property owner of rights commonly enjoyed by other property owners in the same zone;

[c] The granting of a variance will not confer upon the property owner any special privilege that would be denied by this Ordinance to other owners of lands or structures within the same zone; and

[d] The variance request is not based on conditions or circumstances which are the result of actions by the property owner nor does the request arise from any condition relating to land or building use, either permitted or nonconforming, on any neighboring property.

SCI contends that the Board of Appeals acted arbitrarily in two conclusions made during the hearing. First, SCI directs our attention to Paragraph 13 of the Board's findings, which appeared as follows:

13. The Board finds there are no special conditions and circumstances which are peculiar to the land and structure such that a literal enforcement of the provisions of the ordinance would result in unwarranted hardship to the property owners (or the Applicant). The justification provided for the variance is that it would allow additional competition in the cellular telephone industry and the decrease the [sic] need for additional towers in the surrounding areas. The Board cannot find a hardship thus created for the property owner (or the Applicant).

SCI contends that the "circumstances peculiar to this property" are that the property is "uniquely suited as a location for a tower bearing a 100' extension" for three reasons. First, the land is located just outside the three-mile radius of another tower north of the site. Second, the property is the only property in the vicinity that will accommodate the networking requirements of the three users who have subscribed for space on the tower. Third, the property is one of the highest elevations in the general vicinity, which will allow the height of the tower to be less than if it were on a lower elevation. Thus, says SCI, the land is uniquely ideal for a multi-user, 300' tower in that part of the county. As a result, the Board imposed an unwarranted hardship by denying the variance, because SCI will lose the opportunity to construct a tower that will be tall enough to accommodate the needs of the three subscribers and the prospective subscribers who will want to complete their own networks in the future by locating on the proposed tower.

We do not think the Board acted in an arbitrary or capricious manner. Its factual conclusions were supported by substantial evidence and the conclusion it reached is certainly fairly debatable. SCI's recitation of the "peculiar circumstances" of the land neglects several important considerations. The first factor cited by SCI, the proximity of other towers to the subject property is, without more, not dispositive. All land located 360 degrees just outside a three-mile radius of an existing tower—any tower in the zoning district—would satisfy this "circumstance."

The last factor is similarly irrelevant; it amounts to an argument that the Board should have granted a variance for a 300' tower so that SCI would not need a taller tower. This seems to us akin to a builder asking the building inspector for relief from safety regulations in one instance so that he will not have to violate more safety regulations later. A variance administrative proceeding, like a special exception proceeding, involves a particular applicant's request for administrative authorization to engage in a *specific* activity at a *specific* location; it "determines the rights and obligations of the applicant with respect to the utilization of a parcel of property owned by him, and the effects of that utilization upon certain others who may be aggrieved." *Mossburg*, 329 Md. at 506, 620 A.2d 886. Thus, they are adjudicatory, rather than legislative, proceedings. *Id.* One logical extension of this principle is that variances cannot be granted to stem future variance requests, nor may deviations from zoning restrictions find their justification in hypothetical situations. The fact remains that the proposed tower *is* 300' tall, well above the regular permitted height, regardless of the height of an alternate tower on another piece of land.

Moreover, while SCI unfortunately may have painted itself into a corner when it entered into a lease agreement for the property for the purpose of constructing the proposed tower, "the variance that is desired (and the difficulties that would exist if it is not granted) cannot be the source of the first prong of the variance process...." *Crom-*

*well v. Ward,* 102 Md.App. 691, 695, 651 A.2d 424 (1995). As stated in *Kennerly v. Baltimore,* 247 Md. 601, 233 A.2d 800 (1967):

> To grant a variance the Board must find from the evidence more than that the building allowed would be suitable or desirable or could do no harm or *would be convenient for or profitable to its owner.* The Board must find there was proof of "urgent necessity, hardship peculiar to the particular property . . ."

*Id.* at 606–07, 233 A.2d 800 (emphasis added). The burden on the petitioner is indeed heavy, and springs from a recognition that variances permit uses that are prohibited and presumed to be in conflict with the ordinance. *North v. St. Mary's County,* 99 Md.App. 502, 510, 638 A.2d 1175, *cert. denied sub nom. Enoch v. North,* 336 Md. 224, 647 A.2d 444 (1994).

In this case, the first prong of the variance process, as the parties and the Board have recognized, is whether peculiar circumstances surround the property. The Board found that the variance request is based on special circumstances that were created by the actions of SCI, not by the property itself. In other words, the second "special condition and circumstance" claimed by SCI—the needs of its subscribers—are not peculiar to the land, but created by SCI. We agree. The customer requirements cited by SCI as support for its argument serve to illustrate that fact. The needs of SCI's customers have nothing to do with the peculiarity of the property in question. Thus, any hardship claimed by SCI—the second prong of the test—is self-inflicted, and thus not a ground for a variance. *Ad+Soil, Inc.,* 307 Md. at 340, 513 A.2d 893; *Cromwell,* 102 Md.App. at 721–22, 651 A.2d 424.

Because the requirements of § 19.14(b)(3) are conjunctive rather than disjunctive, then, strictly speaking, we need not address SCI's remaining contentions.[4] Since, howev-

---

4. *See Cromwell supra,* n. 1, p. 695, 651 A.2d 424, for the applications of "practical difficulty" and "unreasonable hardship" when they are stat-

er, they can be addressed easily, we will do so to avoid the expense and delay of another appeal. MD. RULE 8–131(a) (1996). SCI contends that the Board deprived it of the due process of law when it found that "the literal interpretation of the ordinance would not deprive the property owners of rights commonly enjoyed by other property owners in the same zone." In support of its argument, SCI relies on all of the previous grants of variances by the Talbot County Board of Appeals since 1974, which show, according to SCI, that the Board's decision in the case *sub judice* was not consistent with its earlier decisions. SCI, however, does not provide further argument in support of its due process claim. Further, SCI did not reproduce these decisions in its appendix, it did not provide us with one citation in its brief, or indicate where in the record we may find such a list or the decisions themselves. Therefore, this argument is not properly before us. *See, e.g., von Lusch v. State*, 31 Md.App. 271, 281–82, 356 A.2d 277 (1976), *rev'd on other grounds*, 279 Md. 255, 368 A.2d 468 (1977) (appellate courts cannot be expected to delve through the record to unearth factual support favorable to appellant and then seek out law to sustain appellant's position).

Finally, again relying on the Board's previous grants of variances, SCI argues that the past decisional history of the Board mandated the application of a "practical difficulty" standard rather than the "unwarranted hardship" standard applied by the Board. Enunciated in *Anderson v. Board of Appeals*, 22 Md.App. 28, 322 A.2d 220 (1974), that standard provides less stringent requirements for the grant of a variance than that applied by the Board. *Id.* at 39, 322 A.2d 220. We see no reason to do so, however. First, as discussed *supra*, SCI provides us with no factual support for its claim. Second, *Anderson* sheds no light on the issue. The zoning ordinance in that case required a showing of "practical difficulty" and "unnecessary hardship" for a variance, and we properly declined to override the ordinance. In fact, we held in that

---

ed in the disjunctive. *See also Chester Haven v. Bd. of Appeals,* 103 Md.App. 324, 340, 653 A.2d 532 (1995).

case that proof of "practical difficulty" was not enough, precisely because the ordinance itself required more. *Id.* at 41, 322 A.2d 220. We do the same here. The Talbot County Ordinance requires a showing of "unwarranted hardship" if the restrictions are literally enforced. We will not disturb this legislative judgment, and we affirm that part of the circuit court's judgment that affirmed the Board's denial of a variance.

**JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY AFFIRMED; CASE REMANDED WITH INSTRUCTIONS TO VACATE THE DECISION OF THE BOARD OF APPEALS AND TO GRANT THE SPECIAL EXCEPTION AND DENY THE VARIANCE.**

**COSTS IN THIS COURT AND IN THE CIRCUIT COURT TO BE PAD ONE-HALF BY APPELLANTS AND ONE–HALF BY APPELLEES.**